495 So.2d 1262 (1986)
STATE of Louisiana
v.
Milburn Wayne BATES.
No. 85 KA 1998.
Supreme Court of Louisiana.
September 8, 1986.
Rehearing Denied October 9, 1986.
*1263 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Morgan Goudeau, III, Dist. Atty., David Miller, Asst. Dist. Atty., for plaintiff-appellee.
Julie Cullen LeBlanc, for defendant-appellant.
COLE, Justice.
Milburn Wayne Bates was convicted of the first degree murder of Shannon Beau Clark, a hitch-hiker Bates picked up near Vidor, Texas and shot to death on a back road outside Krotz Springs, Louisiana on December 4, 1984.
The 12-member jury which found Bates guilty of the first degree murder of Clark also unanimously recommended Bates receive the death penalty. The jury found two aggravating circumstances in Clark's death. It found the defendant was (1) engaged in the perpetration or attempted perpetration of armed robbery or simple robbery and (2) the offense was committed in an especially heinous, atrocious or cruel manner. La.C.Cr.P. art. 905.4 (a), (g). The trial judge accordingly imposed the death penalty.
The defendant appealed, assigned six purported errors in the trial court, and asked his conviction and sentence of death be reversed. Assignment of Errors Numbers one and six argue the evidence presented by the prosecutor was insufficient to establish beyond a reasonable doubt that Bates' killing of Clark occurred during the commission of an armed robbery. The defendant concedes he shot Clark to death, but he argues the killing is temporally separated from the robbery. None of the several different accounts of the armed robbery and shooting of Clark agree in all respects. But it is clear Clark was robbed at gunpoint, made to strip off his clothing and dive into a water-filled bayou. When he emerged a short time later, the car holding his robbers had returned and Clark was shot three times and left for dead. The defendant argues he was not involved in the armed robbery of Clark. He also testified in his own behalf that the killing was unpremeditated and came in response to Clark's attack on Bates. Thus, defendant's argument runs, the killing was not a specific intent killing committed during the actual perpetration of an armed robbery or simple robbery and the first degree murder conviction should be reversed.
*1264 Assignment of Errors Numbers two and three contend the exclusions from the jury of persons opposed to capital punishment produced a jury prone to convict for first degree murder, and such a conviction-prone jury violates the defendant's Sixth Amendment protection to a jury drawn from a fair cross-section of the community. The U.S. Supreme Court has decided this issue against defendant's position. Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
In Assignment of Error Number four, the defendant complains he was misled and prejudiced by the state's response to a request for discovery. The state had advised defendant the victim's wallet was recovered from a co-defendant when the four suspects were arrested in Texas. At trial, testimony showed the victim's wallet was recovered from the possession of Bates upon his arrest. The error was attributed to a misunderstanding between the Texas officers and the Louisiana officers.
The last assignment of error concerns the prosecutor's argument during the sentencing phase of the trial. The prosecutor said the jury should show murderers the community will use the death penalty: "... until you quit killing us, we are going to kill you." The defense counsel immediately objected to the prosecutor's comments and the trial judge admonished the prosecutor to address his remarks to the individual case. There were no further remarks of this nature.
We find none of the defendant's assignment of errors merit a reversal. We affirm the conviction of Bates for the first degree murder of Clark and we affirm the sentence of the death penalty.

FACTS
The events leading to the robbery and shooting death of Shannon Beau Clark in Krotz Springs, Louisiana began in Texas.
Bates was in Baytown, Texas, living with his girlfriend, Mary Anders, the sister of Charlie Shirley. Bates was on parole after serving seven years in a Texas prison on a thirty-year prison sentence for aggravated robbery (armed robbery). He had recently completed a mandatory six-month out-patient treatment for alcohol and substance abuse. He worked for a cable television company.
Charlie Shirley was living at the house in Baytown temporarily. Shortly after he arrived, Shirley's 15-year-old girlfriend, Cheryl Taylor, ran away from her home in Krotz Springs and joined Shirley in Baytown. Bates, 30, and Shirley, 22, decided the runaway juvenile had to be returned to Krotz Springs or all of them would face charges for harboring a runaway. Bates, Charlie Shirley and Cheryl Taylor left Baytown in Bates' car on December 4, 1984. Bates brought along his .22-caliber revolver. He said he purchased it for his girlfriend, but delayed giving it to her until he had "test-fired" it. He purchased ammunition for the handgun just west of Vidor, Texas.
Meanwhile, Shannon Beau Clark, 20, was dropped off in Galveston, Texas by Daswell Hobson at 9:00 A.M. on December 4. Hobson gave Clark five dollars to buy food while he was hitch-hiking. Clark was bound for Houma, Louisiana, to look for work as an offshore cook. Clark began hitch-hiking east. Bates, who testified he was sympathetic to hitch-hikers because he once hitch-hiked too, stopped east of Vidor, Texas and offered Clark a ride.
On the trip to Krotz Springs, Clark drank beer with Bates and Shirley. On one stop, Clark bought bourbon whiskey and more beer, which Clark and Shirley drank. Bates said he drank only beer the entire day. When they reached Krotz Springs, Cheryl Taylor was dropped off at her grandmother's house. Cheryl quickly contacted her friend, Melanie Moreau, a 22-year-old resident of Krotz Springs with a long history of mental health problems. Cheryl told Melanie she had a "surprise" for her. The surprise turned out to be a date with Bates.
The two girls met Bates, Charles Shirley and Beau Clark at the home of Shirley's mother in Krotz Springs. The mother offered to cook supper for the group and they accepted. There was talk of Bates, *1265 Shirley and the two girls going to New Orleans for the night. Meanwhile, the men wanted to play pool and drink beer. Melanie suggested they go to a bar on the outskirts of town called Dago's Landing, because the under-age Cheryl could get in there. The group of five (Bates, Clark, Cheryl Taylor, Melanie Moreau and Shirley) went to the pool hall in Bates' car, and stayed about one hour. The men drank beer and shot pool; the girls drank cokes. Bates testified Clark's behavior was so loud and obnoxious some of the other customers were ready to fight Clark, Bates and Shirley. The bartender, two of the customers, Melanie Moreau and Cheryl Taylor said there was no disturbance in the pool hall during the time the group was inside. All five got back in Bates' car and left Dago's Landing. Cheryl Taylor said Bates drove the car but Moreau said Shirley drove the car from the bar. Both agree the driver turned away from Krotz Springs and headed down an abandoned highway (Old Hwy. 190). He drove a short distance and said he needed to stop the car at this point. Cheryl Taylor said all three men got out. In any event at least Shirley and Clark, the victim, stepped outside to urinate.
Bates' testimony at trial was that he stayed inside the car and only Shirley and Clark got out. He said he was unaware Shirley was robbing Clark until he heard Shirley fire warning shots from Bates' revolver. Bates could not explain how Shirley had possession of Bates' gun. Bates presented no evidence to show he attempted to stop the robbery or disapprove of Shirley's robbery. Bates said he and Shirley never discussed robbing or harming Clark. Bates said he turned around and saw the robbery of Clark when he heard gunshots. He said Shirley ordered Clark to remove his clothes and jump into a small creek. Shirley then handed Clark's clothes to Bates through the car window and Shirley resumed driving the car. A short distance down the road, Bates said he told Shirley to turn around and return for Clark. Bates quoted himself as saying, "Let's go back and get him. I think he's learned a lesson."
In Bates' version, Shirley stopped the car at the bridge and Bates stepped out. Clark was standing on the bridge, nude and cold from his plunge into the water. Bates turned his back on Clark and reached inside the car to retrieve Clark's clothing and hand it to him to dress. At this point, Clark allegedly struck Bates in the back. Then, said Bates, he reacted without thinking. He grabbed his revolver and spun around to face Clark and fired five shots "before I knew what I was doing." Three of the shots struck Clark. Bates then panicked and they drove away, leaving Clark to die.
The state presented a statement Bates gave shortly after his arrest which contradicted his testimony. The confession[1] given by Bates placed only Bates and the victim outside the car during both encounters on the bridge. Bates told St. Landry Parish deputies he stopped the car for the men to urinate, but only he and Clark got out. After both had urinated, Bates drew his revolver, ordered Clark to disrobe and jump from the bridge. Bates' statement said Clark was left in the bayou temporarily while the car drove off, then he ordered Shirley to turn the car around and return to pick up Clark. When the car stopped a second time on the bridge, according to Bates' statement, Clark attacked Bates from behind while Bates was attempting to hand Clark his clothes. The defendant gave the same version of the shooting in the statement and testimony. He explained he implicated only himself in his statement to attempt to protect Cheryl, Melanie and Shirley from prosecution for robbery and murder.[2]
*1266 Testimony of the eye-witnesses, Cheryl Taylor and Melanie Moreau, differ on several facts. Melanie said Bates never left the car during the robbery, while Cheryl placed Bates outside the car, immediately beside Clark and Shirley while Shirley robbed Clark with the use of Bates' gun. Melanie said when the car went back to the bridge after Clark had already been robbed and forced to jump in the water, Bates fired the revolver out a window and Clark was struck three times. Cheryl Taylor said Shirley repeatedly asked Bates not to shoot Clark and that Bates stepped out of the car, ordered Shirley to remain in the car and Bates then shot Clark as both stood on the bridge.
None of the accounts given by Melanie Moreau or Cheryl Taylor mention an attack by Clark on Bates. Nor did they testify Bates told Shirley to turn the car around and return to Clark to give him his clothes back.
Melanie said Bates ordered Shirley to turn the car around moments after Bates examined Clark's wallet and found four dollars. Melanie said Bates was reloading the revolver as the car turned around. Cheryl Taylor, Shirley's girlfriend, said Shirley protested to Bates that he should not shoot Clark.
Melanie said that after Clark was shot, Shirley stopped the car and both Bates and Shirley stepped out. She said one of them spoke to Clark and one of them kicked Clark. She testified Shirley drove a short distance and then suggested running the car over Clark as he lay on the bridge, mortally wounded. Melanie said Shirley turned the car around a second time and drove at Clark, swerving past the body at the last instant. Cheryl Taylor and Bates did not mention Shirley's suggestion of running over Clark's body.
Clark was left for dead on the bridge while Bates, Shirley, Moreau and Taylor returned to Shirley's mother's house. The four had supper. Cheryl Taylor said Shirley's brother came to the house and that Bates, Shirley and his brother drove off and returned in five minutes. Cheryl testified the three men went back to the bridge and Shirley showed his brother the body of Clark on the bridge. State police and sheriff's deputies testified an anonymous telephone caller alerted them to the presence of a body near Dago's Landing.
Following the meal, Bates and Shirley asked the girls to accompany them to New Orleans "to party." The four left in Bates' car but they instead drove west. The route taken out of Krotz Springs by Shirley was on back roads. They traveled to Fort Worth, Texas, spent one night there and were arrested two nights later as they slept in a motel in Sansom Park, Texas. They all waived extradition and were returned immediately to St. Landry Parish.
The shooting occurred at approximately 4:00 P.M. on December 4, 1984. The day was cold and rainy. It was raining when Clark was forced to disrobe and jump in the water. The sheriff's office received a telephone call about 6:00 P.M. informing a body was on the road near Dago's Landing. A state police trooper and a sheriff's deputy found Clark's body on the roadway in the middle of a bridge on old Hwy. 190, over Two O'Clock Bayou. Clark was curled in a fetal position. He was nude except for socks. Trooper Jerry Overfelt said he spoke to Clark and Clark immediately opened his eyes and then closed them. Clark never said anything. The trooper wrapped Clark in a thermal blanket and waited for the ambulance. Clark was brought to a local hospital. He died at 8:00 P.M. the same night. A deputy coroner said the autopsy results showed Clark died of shock and loss of blood from the three gunshot wounds. The wounds were to the upper back, the back of the neck and the leg. A blood alcohol count taken from Clark at the hospital showed a level of alcohol at death of .21.

ASSIGNMENT OF ERRORS NOS. 1 AND 6
The defendant concedes he shot Clark and inflicted the fatal wounds. He attempts to overturn the first degree murder conviction by showing the evidence was not sufficient to support a finding that the *1267 murder of Clark was committed while Bates was engaged in the perpetration of armed robbery.
La.R.S. 14:30 A.(1) provides:
First degree murder is the killing of a human being: (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery or simple robbery.
To affirm this conviction, we must find sufficient evidence to conclude Bates had specific intent to kill Clark or to inflict great bodily harm and that Bates was engaged in an armed robbery or simple robbery when the killing occurred. Bates' argument is that the killing of Clark was a spontaneous shooting death, a reflexive action in response to Clark's alleged attack on Bates while Bates' back was turned. Bates further argues that he was not a participant in the robbery of Clark; Bates contends Shirley was the only person who robbed Clark.
We find the evidence fully supports the conclusion Bates had the specific intent to kill or inflict great bodily harm upon Clark when he shot him three times. Bates is the only person who testified Clark attacked him from the rear. Of two eye-witnesses, neither mentioned such an attack when they described the shooting death in testimony or in any prior statement.
Cheryl Taylor and Melanie Moreau said Clark was robbed, stripped of his clothes and forced to dive from the bridge. The car was then driven a short distance from the bridge when Bates ordered Shirley to turn the car around and return to the bridge to find Clark. Cheryl Taylor testified:
A. Then Wayne (Bates) told Charlie (Shirley) to turn the car around and Charlie says, "Why?" And then Charlie said no, then Wayne says, "Turn the car around," and Charlie says, "No," and Wayne says, "You better turn the car around," so Charlie turned the car around.
Q. Y'all headed back toward the bridge where you left Beau?
A. Yes, sir.
Q. What happened when you got to the bridge?
A. They stopped the car and Wayne got out and Charlie
Q. Where was Beau?
A. He was on the side of the road.
Q. He was up on the bridge now?
A. Yes, sir.
Q. Was he doing anything?
A. He was waving his hands like this. (Indicating)
Q. Like what?
A. Like this, I guess trying to flag us
Q. Stand up and show me, I can't see you behind there.
A. (Complying) He was doing this on the side of the road.
Q. Then what happened?
A. Then Charlie stopped the car, Wayne got out and then Charlie got out, and Charlie said, "Don't do it, man, don't do it," and Wayne told him to shut up and get back in the car, and that's when Wayne shot him.
Q. Who shot him?
A. Wayne.
Q. Did you see where he shot him?
A. When I turned around I just seen the guy bleeding from the neck.
Q. What happened after that?
A. Then they got back in the car Wayne got back in the car and we went to Krotz Springs to his mama's house. (Shirley's mother's house)
Melanie Moreau gave the following account of the shooting of Clark on direct examination:
Q. Okay, that's all right. All right, so Beau jumped off the bridge and there were more shots fired by Charlie. Then what happened?
A. Then after that we stayed in the car a few minutes, Charlie, Cheryl, Wayne and myself. Anyway, Wayne was in the back seat on the passenger side.
Q. Uh-huh.

*1268 A. Anyway, Wayne opens the wallet and he saw four dollars, he goesHe says, "That's all that's here is four dollars."
Q. Wayne said that; this guy said that?
A. Yes that guy right there.
Q. Then what happened?
A. We just gotWe just
Q. Y'all got in the car and left and went back to Krotz Springs?
A. No, we were in the car, we were in the car; you know what I'm saying? We were in the car.
A. Uh-huh.
Q. And then wethen Charlie started the motor then we started heading towards Krotz Springs.
A. Uh-huh.
Q. Then all of a sudden, I don't know, I didn't notice howI didn't notice how Wayne got the gun, I didn't notice how.
Q. The last time you saw the gun Charlie had it.
A. Yeah, Charlie had it, but I didn't notice; you know what I'm saying?
Q. Uh-huh. But then you noticed Wayne had the gun?
A. Yeah, Wayne had the gun, and he saidHe started loading it up. I told him, I said, "Oh, my God," I said, "don't do what I think you're going to do," and he said, "Just don't" He said, "Just don't look babe," he said, "just don't look." And then we was going down the road and he took his hand and he done like this, you know, leaning
Q. Well, wait, had y'all left the bridge?
A. Yeah, we had left the bridge.
Q. And the car was heading toward Krotz Springs, huh?
A. Yes, uh-huh.
Q. Well, did y'all have to turn the car around?
A. Yeah, we had to turn the car around.
MISS CULLEN: Your Honor, I'm going to object again to the leading questions.
MR. MILLER: Well, I'm not leading, I don't know what she's going to say.
THE COURT: Don't lead the witness.
Q. I mean, I'm just having trouble The car, if y'all took off heading toward Krotz Springs, you had to come back to the bridge?
A. Yeah, we had turned around.
Q. And that's when Bates said what he said?
A. Well, we were going down the road and then that's what he had said.
Q. All right, then what happened? Y'all turned around and come back toward the bridge.
A. We were already turned around.
Q. All right. Did you see Beau when you got back to the bridge?
A. Well, he was standing down the road waving his hands.
Q. What you mean waving his hands?
A. You know, like this, you know, trying to flag us down.
Q. Were y'all the only car that y'all saw around there?
A. We were the only car on there.
Q. And so you were heading back toward him and then what happened?
A. The next thing I knew, Wayne stuck out his hand and started shooting at him.
Q. Could you see if Beau was hit or not?
A. Well, I heard him when he said, "Aaah."
Q. How many shots you think were fired by Bates?
A. About three or four.
When Bates aimed the weapon at Clark and pulled the trigger, he had the specific intent to kill Clark. Bates' version that he fired in self-defense or as a spontaneous reflex was not supported by any evidence, other than Bates' testimony. The officers who found Clark's body testified they thoroughly investigated the bridge and roadway and found nothing which could have been used as a weapon. The jury chose not to believe the defendant's version of the killing.
There is no doubt an armed robbery occurred. The testimony of Bates, Melanie *1269 Moreau and Cheryl Taylor all confirm that fact. Additionally, items from Clark's wallet were found in Bates' wallet and Bates was found to possess Clark's wallet at the time of his arrest. Clark's clothes were recovered from the home of Shirley's mother in Krotz Springs. Cheryl Taylor testified Bates told Shirley to remove the clothes from the car. Bates' account portrays Shirley as the only person who robbed Clark and that Bates neither assisted or suggested Clark be robbed. Cheryl Taylor is the only eye-witness who places Bates outside the car while Clark was robbed. Melanie Moreau said Bates was seated in the rear seat of the car with her when she became aware that Shirley was pointing the revolver toward Clark and demanding his money and clothes. However, she said, Bates did nothing to intervene and she said Bates accepted Clark's clothes from Shirley. Melanie said the defendant then went through Clark's wallet and after discovering only four dollars, Bates ordered the car turned around and returned to the bridge, to catch Clark emerging from the bayou.
The argument of defendant in these assignment of errors presents two questions: (1) Was Bates a principal to the armed robbery? and (2) Did the killing of Clark occur during the perpetration of the armed robbery?
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. R.S. 14:24. Defendant was present at the time of the robbery, either outside the car and immediately beside Clark and Shirley, or seated inside the car when Shirley used the gun and fired warning shots at Clark. He was certainly present at all times during the robbery but did nothing and said nothing to prevent the robbery. He accepted the clothes of the victim from Shirley and went through the wallet. Items from the victim's wallet were later found in Bates' wallet and Clark's wallet was found in the defendant's possession when he was arrested. He therefore shared in the proceeds of the robbery. The robbery occurred with the use of Bates' gun and his car. It is true there is no evidence that Bates and Shirley planned the robbery in advance. Nor did anyone testify Bates held the gun on Clark during the first confrontation on the bridge or that he threatened Clark at that time or forced the removal of his wallet or clothing. Nevertheless, we find ample evidence to conclude Bates was a principal to the robbery of Clark. This court has affirmed an armed robbery conviction under similar facts in State v. Gutter, 393 So.2d 700 (La.1981).
Gutter was one of three men who confronted the victims. The other two confronted the victims face to face and robbed them while passing a gun from one perpetrator to the other. The Court summarized Gutter's participation:
Gutter was the driver of the vehicle which turned into the darkened service station and pulled in directly behind the Jackson vehicle. During the actual perpetration of the robberies, Gutter stood approximately one foot from the rear of Jackson's car. From his position, Gutter was able to observe the robberies, yet he made no attempt to interfere with or otherwise question the acts of his companions. An available inference, supported by Jackson's testimony, is that Gutter served as a "lookout" for his two companions. This inference is strengthened by evidence establishing that immediately after the robberies, Gutter returned to his car with his two companions whereupon one of them handed Tyler's wristwatch to Gutter who accepted it. Thereafter, the trio divided the stolen monies between themselves, climbed into their vehicle, then left together with Gutter again at the wheel. (footnote omitted.) 393 So.2d at 702.
The Court concluded:
Considering only the evidence presented by the State, it can fairly be said that the State made a showing that two or more persons committed a crime and that Gutter either combined or agreed to commit the criminal act. Supra.
*1270 In Bates' case, he was either inside or outside the car at the time of the robbery. He did nothing to stop the crime or to tell Shirley that his actions were wrong, or to take his gun from Shirley. Bates kept possessions of Clark that were taken during the robbery. There is sufficient evidence to find Bates was a principal to the armed robbery of Clark, even though there is no evidence to show Bates held the gun during the robbery phase of this crime.
Defendant argues Clark's death did not occur during the commission of the armed robbery, but was rather temporally separated from the robbery. The evidence fully supports the conclusion Clark was first robbed, stripped of his clothes and ordered to jump from the bridge, then left in the water a few minutes while the car holding Bates, Shirley and the two girls drove off. But the car was turned around almost immediately and was driven back to the spot where Clark had now emerged from the water and was standing on the bridge, naked, cold and waving his arms to flag down the car. There is a space of a very few minutes between the first and second confrontations on the bridge, and Bates argues the robbery had concluded and the killing was a reflexive action which occurred without specific intent or relation to the robbery. This Court has concluded in three somewhat similar cases a killing did occur during the perpetration of an armed robbery. We have re-examined those cases for guidance on this issue. State v. Shilling, 440 So.2d 110 (La.1983); State v. Anthony, 427 So.2d 1155 (La.1983); and State v. West, 408 So.2d 1302 (La.1982). In each case, the defendant argued the killing did not occur during the perpetration or attempted perpetration of an underlying felony.
The Shilling case presents the closest factual pattern to the present case. The defendant and a co-defendant beat, kicked and stabbed the victim, robbed the victim while he was senseless and left him for dead alongside a road. Upon returning to the defendant's residence, they discovered Shilling's knife was lost. They returned to the crime scene, found the knife and also found the victim still alive, although bleeding profusely, and trying to hitchhike to safety. The defendants then kidnapped the victim, drove to a more secluded location and brutally killed him.
Shilling contended the sequence of events, including the abandonment of the victim for dead the first time, did not constitute a continuous transaction and was not a first degree murder. The court rejected that argument with this explanation:
Although the passage of time and/or the fact that the perpetrator leaves the scene of the robbery may place a later killing of the robbery victim outside the scope of the first degree murder statute, these factors must be considered in light of other circumstances involved in the case in question. The circumstances in the case before us were established by two witnesses who testified that after the first brutal attack and the victim's being left for dead, the assailants drove immediately to defendant Shilling's trailer. Once inside Shilling and his companions proceeded to rinse off the blood which had gotten on Shilling's hand and Billiot's knife. Realizing that they had lost Shilling's knife, the two men returned to the scene of the crime to retrieve the knife. Upon their arrival they discovered the victim, covered with blood and attempting to hitchhike. After putting the victim inside their automobile, they drove to a more secluded area where they finished him off. It is reasonable to view the armed robbery as not being concluded until defendant and his companion, to avoid detection, or simply to reclaim the knife for further use, made off with the knife they used to murder and rob the victim.
Under these circumstances the jury did reasonably find that the entire incident, from the time the victim Stache was assaulted and robbed on the side of the road beside the car until he was drowned in the bayou shortly thereafter, constituted commission of first degree murder, i.e., a specific intent killing during perpetration of an armed robbery.
West and Anthony also address the continuous criminal transaction. In Anthony, *1271 the Court considered whether a killing which took place after a felony was committed was nonetheless committed in the perpetration of the felony. The homicide occurred during the defendant's flight from the scene of an aggravated burglary. The killing was considered to have possibly been a means to conceal his presence at the burglary scene. 427 So.2d 1155, at 1159. The Court noted other jurisdictions have held a homicide is committed during the course of a felony if it is within the res gestae of the underlying felony. The Court said:
When res gestae has been used to determine whether the homicide was committed in the perpetration of a certain felony, it seems to have been a short way of saying that the underlying felony and the homicide form part of one continuous transaction which occurred without a significant break in the chain of events. Supra, at 1158.
In West the Court said the robbery and shooting were one criminal incident:
The armed robbery and the shooting which followed constituted essentially a single criminal incident. The offenders never left the victim; instead, they escorted her from the scene of the armed robbery to the location where the shooting took place. Under these circumstances it is apparent that the killing occurred as part of the armed robbery.
In the present case, the defendant did leave the victim for a brief period. He did not encounter the victim, as did Anthony, while fleeing the scene of the underlying felony. This case is analogous to Shilling, except Clark was not left for dead after the first confrontation. Shirley had fired several shots near Clark, both while Clark was on the bridge and while Clark was in the water. Shirley apparently fired the first shots to force Clark to give up his wallet and clothes, then fired a second round of shots to keep Clark in the water. There is no indication Clark suffered any gunshot wounds during the period Shirley fired the gun. It is reasonable, as in Shilling, to view the armed robbery as not being concluded until the defendant Bates, to avoid detection, returned to the scene of the robbery and shot Clark, leaving him mortally wounded. The death of Clark aided or abetted the commission of the robbery by making detection of the perpetrators more difficult. It is also reasonable the jury could have concluded Bates killed Clark in the belief his parole status in Texas (for an earlier armed robbery there) would be protected by killing the person who could implicate him in the robbery.
The defendant attacks the credibility of Cheryl Taylor and Melanie Moreau, the eyewitnesses. Cheryl Taylor, a 15-year-old runaway, changed her story several times, but swore at the trial her testimony was the truth. She admitted she lied earlier, believing she could help her boyfriend, Charlie Shirley. Melanie Moreau quit school in the ninth grade. She has had extended mental health treatment, including a period of hospitalization following this incident. She testified she takes "nerve medicine" and was taking medication at the time of the robbery-murder. Melanie Moreau proved to be a credible witness. Her account of the events of December 4, 1985, withstood cross-examination. Cheryl Taylor, 15 at the time of the crime, repeatedly answered, "I don't know" when pressed to retell her story upon cross-examination. Nonetheless, the accounts told by Moreau, Taylor and the defendant all relate the same essential story: that Clark was robbed by Shirley without interference by Bates, that Clark's clothes and wallet were handed to Bates who immediately took the money as his own, and after Shirley had driven away from the scene of the robbery, leaving Clark alive, it was Bates who ordered the car turned around. Bates then reloaded his revolver and when the car stopped at the bridge, he shot Clark three times and left him for dead. The defendant presented his version of a killing committed without specific intent and in "reflex" to an attack from behind by the unarmed Clark. The jury chose to disbelieve Bates and accept the versions told by Taylor or Moreau or both.[3] *1272 There is no merit to defendant's contention of a lack of evidence of first degree murder.

ASSIGNMENT OF ERRORS NOS. 2 AND 3
In assignment of errors two and three the defendant argues he was denied the right to a trial by a fair cross-section of the community, a Sixth Amendment protection, because excluded from the jury were persons who said they could not impose the death penalty in the penalty phase of the trial. Defendant reasons this exclusion resulted in a jury prone to convict for first degree murder. Defendant relied upon Grigsby v. Mabry, 758 F.2d 226 (U.S. 8th Cir.1985). Defendant's argument was prepared prior to the United States Supreme Court decision on Grigsby under the name of Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Supreme Court decided the issue against defendant's position. A state, under the ruling, may permissibly exclude from a jury during the guilt stage those persons who are Witherspoon-excludable, Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), from the penalty phase of the deliberations. In Lockhart's language: "... Witherspoon-excludables, or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objections of the fair cross-section requirement [under the Sixth Amendment] ... It is for this reason that we conclude the Witherspoon-excludables do not constitute a `distinctive group' for fair cross-section purposes, and hold that `death qualification' does not violate the fair cross-section requirement." Id., ___ U.S. at ___, 106 S.Ct. at 1766.
This Court has itself rejected similar arguments. State v. Ford, 489 So.2d 1250 (La.1986); State v. Lowenfield, 495 So.2d 1245 (La.1985), No. 85-Ka-0255; State v. Byrne, 483 So.2d 564 (La.1986); and, State v. Jones, 474 So.2d 919 (La.1985). These assignment of errors lack merit.

ASSIGNMENT OF ERROR NO. 4
Assignment of Error No. 4 concerns defendant's complaint as regards evidence showing he was found in possession of the victim's wallet when arrested in Texas. The trial judge refused to grant a mistrial.
The defendant had requested the state inform him of all evidence to be introduced at trial. Defense counsel was given the opportunity prior to trial to inspect all evidence to be offered. The victim's wallet at that time bore an evidence tag which stated the wallet had been taken from the person of Charles Shirley. However, two of the Sansom Park, Texas policemen testified at trial the victim's wallet was taken from the person of Bates. Neither of the Texas policemen could explain why the wallet was marked as being obtained from Shirley. A St. Landry Parish deputy sheriff said he wrote the evidence tag, and said he understood from the Texas police the wallet had been taken from Shirley.
Defense counsel argued the defendant was surprised by this mistake and was prejudiced. Defendant moved for a mistrial, asserting the crucial part of the state's case was to link Bates to the robbery of the victim. The defense had assumed the evidence tag was correct and that the victim's wallet was recovered from Shirley, thus at least partially removing Bates from a direct link with property of the victim.
Defendant bases his move for mistrial upon La.C.Cr.P. art. 775: "...Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside *1273 the courtroom makes it impossible for the defendant to obtain a fair trial...." The assignment of error falls short of prejudicial conduct. The prosecutor supplied incorrect information unwittingly. There is no allegation or flavor of bad faith on the state's behalf.
A mistrial is a drastic remedy and unless mandated by La.C.Cr.P. art. 770 should be declared only where the defendant has suffered substantial prejudice which would deprive defendant of a fair trial. State v. Jarman, 445 So.2d 1184 (La.1984); State v. Smith, 430 So.2d 31 (La.1983). Defendant complains he was "severely impaired because of the `evidence' that he was aware of changed after the commencement of the trial." The crucial issue was defendant's participation in the armed robbery of the victim. The state had to show he was at least a principal in the robbery to support the first degree murder charge. The defendant's possession of the victim's wallet when Bates was arrested was used as evidence of Bates' participation in the robbery or at least its illegal fruits.
There was substantial other evidence regarding Bates' culpability in the robbery of Clark. Bates gave a statement saying he robbed Clark by himself. He testified that he removed and kept the money from the victim's wallet. An examination of Bates' own wallet when arrested disclosed the victim's birth certificate and a social security card. The fact that the victim's wallet was also seized from the person of Bates upon his arrest was, in these circumstances, cumulative evidence. An important consideration is whether this defendant was, by the omission of this evidence, mistaken as to the strength of the state's case. We do not believe he was. We also consider the impact of the evidence concerning the victim's wallet in light of the total evidence and find it was cumulative evidence, and that the prejudice was not substantial. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 5
This assignment of error alleges the prejudicial impact of remarks made by the prosecutor during the penalty phase of the trial. As the prosecutor began his argument, he said: "I think in the short time we've been with him we've learned a good bit about him. He's a criminal. He had two prior chances. He's lost his third chance. And he's a liar. He is dangerous. The law means nothing to him. Human life means nothing to him, absolutely nothing. The law means absolutely nothing. Buying guns on parole, running around with a 15-year-old runaway, armed robbery before, forgery, probation, revocation on the forgery for some misdemeanor theft. I mean, in his thirty years he has done enough. It's time to stop him. And it's time to send a message that until you quit killing us, we're going to kill you. Can we get that through their heads?"
Defendant's counsel immediately objected and asked the judge to limit the prosecutor's arguments to the case before them. The judge agreed with the objection, told the prosecutor to speak only to the particular individual, and allowed argument to continue. The prosecutor made no further general references, as he did above. Defense counsel's objection did not include a request that the jury be told to disregard the comments. The objection served its purpose: the prosecutor confined his remarks to the Bates trial.
Before this Court will reverse a conviction or sentence on the grounds of improper closing argument, it must be thoroughly convinced the remarks influenced the jury and contributed to the verdict. State v. Ford, 489 So.2d 1250 (La.1986); State v. Mattheson, 407 So.2d 1150 (La.1981). This Court has warned the prosecutor's closing argument may not be converted into a plebiscite on crime. State v. Hayes, 364 So.2d 923 (La.1978). In State v. Sugar, 408 So.2d 1329 (La.1982), the Court said, "... we do caution the prosecutor that he flirted with reversible error in his closing argument to the jury. Closing argument is to be limited to `evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case. The argument shall not appeal to prejudice.' La.C.Cr.P. art. 774."
*1274 We do not find the prosecutor's remarks in the present case rise to the level of reversible error. We are not convinced, considering the prompt objection and the court's ruling, the prosecutor's remarks influenced the jury and contributed to the verdict. A major portion of the remarks giving rise to the objection constituted a factual commentary on defendant's background. The general references terminated with the court's admonition to counsel. There is no merit to this assignment of error.

CAPITAL SENTENCE REVIEW
Louisiana Supreme Court Rule 28 and La.C.Cr.P. art. 905.9 require this Court review every death sentence to decide if such penalty is excessive. In determining whether the sentence is excessive the Court is required to determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
We find no prejudice in this sentence. The defendant and the victim were both white males. Neither Bates nor Clark lived in St. Landry Parish. Defense counsel asked the jury to consider the possibility that Bates, an "outsider" from Texas was being singled out as the killer rather than charge Shirley, Cheryl Taylor or Melanie Moreau, all from Krotz Springs, with the murder. Shirley was awaiting trial for second degree murder when Bates was tried. An examination of the record shows no attempt by the prosecutor to portray Bates as an "outsider."
We have previously discussed the prosecutor's remarks in the penalty phase. Except for his brief general comment relative to retaliation for killing, the prosecutor confined his argument to the testimony presented and to his opinion of the defendant. The prosecutor's argument did not inject passion or an arbitrary factor into the deliberations. The jury could have based its decision upon the evidence presented, rather than an appeal to passion.
The jury deliberations regarding the sentence to impose upon Bates lasted thirty minutes. At the close of the guilty phase of the trial, the jury asked the judge if the verdict form should include the jury's sentence recommendation. We do not regard this advance decision on the sentence as presenting an arbitrary factor. Defendant argues, however, that an arbitrary factor was created when the judge agreed with the prosecutor's suggestion that the judge ask the jury whether it had decided upon a sentence. This suggestion came at the end of the day and the end of the guilty phase. The judge knew if a life sentence was recommended, the jury could be excused and the trial ended. Defense counsel said at the time if the jury had decided on a death penalty, the trial would continue the next day with a sentencing hearing. All parties, including defendant, agreed in advance the trial judge could inquire of the foreman whether the recommendation was "not to have capital punishment." The foreman replied in the negative. Therefore, trial continued the next day with the capital sentence hearing. Since the jury had already indicated it had made up its mind on the sentence recommendation, we do not conclude that the court's inquiry injected an arbitrary factor. Defendant and his counsel knew what the inquiry was intended to determine and all parties agreed the question should be asked of the jury.
The jury was not advised by the judge that if they failed to reach a unanimous decision on the death penalty, he would impose a life sentence. The judge told the jurors they had to find at least one statutory aggravating circumstance to form the basis for the death penalty. He said they must also consider any mitigating circumstances before deciding on the sentence. He did tell the jurors they were not bound by law to sentence defendant to death. He said the jury could recommend a life sentence *1275 and could do so even if it found no mitigating evidence. And, he instructed the jury a death penalty or a life sentence recommendation needed to be unanimous. The jury was, therefore, not misled into thinking it had to reach a recommendation of the death penalty.
Defendant's counsel lost her composure twice as she sought to begin the closing argument during the penalty phase. Nonetheless, counsel subsequently delivered a capable, strenuous argument in favor of a life sentence for defendant. We do not find this loss of composure injected an arbitrary factor.
Defendant presented only one piece of evidence during the penalty phase, his discharge from the U.S. Army. There appears to have been nothing more that could have been introduced. Defendant had taken the stand in his defense during the guilty stage of the trial and testified as to his life history and his problems with drug and alcohol abuse. The jury was well aware of his prior criminal activities.
The jury found two statutory aggravating circumstances. It found the crime occurred while the defendant was engaged in the perpetration or attempted perpetration of armed robbery; and the crime was committed in an especially heinous, atrocious or cruel manner. We have previously concluded the evidence is sufficient to find the homicide was committed by defendant during the defendant's participation in an armed robbery of the victim. While this defendant may not have held the gun on the victim during the robbery, he was a principal to the robbery and shared in the fruits of the robbery.
Defense counsel argues the killing of Clark was not committed in an especially heinous, atrocious or cruel manner.[4] The victim was shot three times in rapid succession, and was left for dead. There was no torture of the victim. Nonetheless, we cannot ignore that Clark was forced to strip naked on a cold, wet December day, then forced at gunpoint to dive into a bayou. When he emerged from the water he was shot three times, once in the leg, once in the upper back and once in the neck. The shooting took place about 4:00 P.M. There is testimony Bates or Shirley kicked Clark as he lay on the ground. There is testimony Bates and Shirley returned to the scene where Clark still lay, and his body was displayed to Shirley's brother. Over two hours later, after an anonymous tip, police found Clark on the bridge, curled in the fetal position, nude except for his socks. He reacted to the officer speaking to him by blinking his eyes, but he was unable to speak. He died at 7:57 P.M. The autopsy revealed he died of shock and massive hemorrhaging from the gunshot wounds. The coroner said a great deal of blood was found in Clark's mouth. A blood analysis revealed Clark's blood alcohol content to be .21 at the time of his death. We do not know if Clark lost consciousness upon being shot. There is evidence he retained some consciousness over two hours after he was shot. The fact that Clark slowly bled to death and the defendant returned to the scene to show the victim's body to a third person suggests callousness and no remorse. While the actual shooting may not have been especially atrocious, the circumstances surrounding the killing can reasonably be found to be a cruelly executed homicide.
The failure of one aggravating circumstance would not invalidate the death penalty if another aggravating circumstance is also found and is upheld upon review. La. *1276 C.Cr.P. art. 905.3; State v. Rault, 445 So.2d 1203 (La.1984). Therefore the court is not required to overturn the death penalty if it determines the evidence supports the jury's conclusion the crime occurred while Bates was engaged in the perpetration of an armed robbery.
The state relied upon no more than the facts of the offense to argue the crime was committed in an especially heinous, atrocious or cruel manner. The state presented its argument on this aggravating circumstance in this fashion:
There are two aggravating circumstances in this case. The armed robbery which you found in the guilt portion of this case; he could not have been convicted of first degree murder without a finding of that armed robbery. And the second one, as I say, is a followup to that. One is enough. One is enough. If it were just the armed robbery and a clean killing, without any suffering by Beau Clark, whom we don't know and nobody will ever know, it would be enough to kill him. But the way it was done, his actions, his words show us no remorse, no sorrow. I mean, he is cold. Phrases like, "Don't look, baby," and "I get off on violence," and running right back and eating the two helpings of food. I mean, is thisThis is someone we don't want with us. We do not want him with us. We do not want to take the chance he'll ever be with us. And the only way we can insure that, the only way, is for you to enact the death penalty, to make that recommendation. It's provided for in the law, is appropriate in this case, as I explained in the opening statement. I submit one of the mitigating circumstances apply here. I cannot think of one, not even close.
Can you imagine what Beau Clark went through from the time he was plunged into that water out there, cold, rainy, without clothes, he'd been shot, and left there on that pavement in that cold and rain for some four hours before he died. We should never take the chance that that will happen again. And this man is capable, he is capable of doing anything if he did that.
I submit it on that basis.
Considering all of the above, we do not find the penalty imposed in this case to be excessive.

PROPORTIONALITY OF THE SENTENCE
We must now decide whether or not the sentence in this case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. An inference of arbitrariness arises when a jury's recommendation is inconsistent with the sentence imposed in similar cases in the same jurisdiction. S.Ct. Rule 28, 905.9.1 (c).
The defendant, Milburn Wayne Bates, was one month short of his thirtieth birthday when this crime occurred. He is unmarried and has no children. He spent his early years in west Texas. He served in the United States Army in 1972 and 1973, serving in the Vietnam theater. He received a general discharge under honorable conditions and explains he was discharged for extended use of methamphetamines. He said this substance abuse began while he was stationed overseas. A year following his discharge from the Army he was arrested and convicted of forgery. He received a four-year probationary sentence. His probation was revoked in March 1975 following his arrest for misdemeanor theft of services from a hotel. He then served two years of his forgery sentence. In May 1977 he was charged with aggravated robbery (the Texas statutory equivalent of armed robbery). He had robbed a store clerk at knifepoint and took $585.00. He received a 30-year sentence for the robbery. He served seven years in a Texas prison and was released on parole. He was free on parole less than six months when Shannon Beau Clark was robbed and killed. During his release he completed a mandatory substance abuse program, as part of the conditions for his parole. Defendant testified he is aware he cannot control his use of hard liquor. He drank beer the entire day of this offense. The Capital Sentence Report shows he obtained a high *1277 school equivalency diploma and received two degrees from college, obtaining an associate of arts degree in business law and a bachelor's degree from the University of Houston and Lee College. Between the time of his release from the Texas prison and this offense he was working for a cable television company in the Baytown, Texas area. Bates is intelligent, but he is a repeat offender of armed robbery and his history shows an escalation of his tendency to use violence.
According to the Uniform Capital Sentence Report, there have been four other first degree murder verdicts returned in this jurisdiction since the restoration of capital punishment. In only one of these other cases did the jury recommend the death penalty. State v. Carmouche, 480 So.2d 728 (La.1985). The defense attorney in Carmouche also represented an important prosecution witness and this Court remanded to the trial court for the "appointment of a new attorney to represent the defendant for the development of additional facts not of record pertaining to whether the defense counsel's performance was deficient and whether the deficiencies, if any, prejudiced the defense or deprived the defendant of a conscientious advocate for his life, and for the trial court's decisions on these issues." 480 So.2d at 729. The Court did not otherwise consider the case. The victim in Carmouche was an eighty-one year old woman. The offender raped and shot her. At the least he handled her wallet and may have removed money from it. Carmouche was nineteen at the time of the crime and had no juvenile record. He did have aggravated battery and attempted armed robbery charges pending against him arising out of an incident which had occurred approximately one month before the murder for which he stood trial.
The remaining three cases resulted in life imprisonment for the defendants. The jurors in State v. Gibson, tried in September of 1985, could not reach a unanimous recommendation and the judge sentenced the defendant to life imprisonment. According to the newspaper clipping included in the judge's Uniform Capital Sentence Report, Gibson and a girlfriend picked up the victim near the latter's home. As they drove, Gibson became angry with the victim. He stopped the car and forced the victim outside at gunpoint. He pistol whipped the victim and then the two men returned to the car. Gibson drove a little farther and stopped again. He forced the victim out of the car at gunpoint and asked for money. After forcing the victim to disrobe, Gibson shot him in the back of the head. Gibson is white and the victim was black.
In the remaining two cases, the jury recommended a life sentence for the defendants. This Court reversed the first degree murder conviction in State v. Andrews, 452 So.2d 687 (La.1984). The basis of the conviction was the defendant's intent to kill or inflict great bodily harm upon more than one person. Andrews had told his girlfriend's mother and sister that he intended to kill both of the Anderson brothers. When he spotted the first brother, Andrews chased him with a gun, but fired no shots. Andrews then located the second brother, shot and killed him. This Court reversed the conviction because "no rational trier of fact could have concluded beyond a reasonable doubt that Andrews, by firing at Patrick, actively intended to kill both Patrick and Joel." 452 So.2d at 689. (Emphasis in the original.) The Court modified the conviction to second degree murder, which carries the same sentence (life) as the defendant had already received. The defendant and the victim had been involved in a fight and the victim's brother joined the melee. The Uniform Capital Sentence Report says that both the defendant and the victim were black.
The Third Circuit reversed the first degree murder conviction in State v. Delahoussaye, 443 So.2d 648 (La.App.3d Cir. 1983), because a minister had walked into the courtroom and read certain Biblical passages to the jury. These verses included ones advocating death for the person who kills another. The opinion contains no facts of the case, but the judge, in the Uniform Capital Sentence Report, states that the case involved two young, white male adults who drank together all night *1278 and that the killing occurred in the morning following an argument.
Bates in this case, Carmouche and Gibson involved a killing allegedly committed during the perpetration of a felony enumerated in La.R.S. 14:30. Bates and Carmouche received the death penalty; Gibson did not. Carmouche had no prior history of criminal activity; Bates does. Both Bates and Gibson had been drinking before the crime.
Since we have found Bates was a principal to the armed robbery of the victim, the death penalty in this case is not disproportionate. In State v. Byrne, supra, the Court observed it has consistently affirmed the death penalty in "single-shot" armed robbery cases. State v. Busby, 464 So.2d 262 (La.1985); State v. Wingo, 457 So.2d 1159 (La.1984) cert. den. 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. den. 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Knighton, 436 So.2d 1141 (La.1983), cert. den. 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. James, 431 So.2d 399 (La.1983), cert. den., 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Lindsay, 404 So.2d 466 (La.1981), cert. den., 464 U.S. 908, 104 St.Ct. 261, 78 L.Ed.2d 246 (1983). In a footnote, the Court added the following regarding its proportionality review:
We note that the proportionality review of death sentences within a judicial district (as opposed to a Parish-wide review as both the state and defense counsel assume is required by Section 4), rather than a state-wide basis passes constitutional muster. State v. Flowers, 441 So.2d 707 (La.1983), cert. denied [466] U.S. [945], 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984). We do not intend to change established procedure by referring to cases throughout the state; however, we note that the district-wide inquiry is the minimum required by the constitution. Therefore, a state-wide inquiry, more encompassing than a district-wide inquiry, would also pass constitutional muster.
State v. Byrne, p. 578, n. 8.
We find the jury's recommendation of the death penalty is not disproportionate to recommendations in other cases.

* * * * * *
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until defendant fails to petition timely the United States Supreme Court for certiorari or, in the event defendant acts timely, that court denies defendant's petition for certiorari.
CONVICTION AND CAPITAL SENTENCE AFFIRMED.
NOTES
[1] Bates' statement was admitted into evidence and read aloud before the jury by the deputy who took the statement. The fact of the statement having been taken was not disputed, but Bates' testimony presented his own version of the robbery-murder of Clark.
[2] Charles Shirley has been charged with second-degree murder in the killing of Clark. Bates was the first to be tried.
[3] That credibility decision is left to the fact-finder in most cases and will not be overturned on appeal. State, ex rel Graffagnino v. King, 436 So.2d 559 (La.1983). Once the defendant took the stand and offered a defense which the jury rejected, that defense failed and defendant was guilty of specific intent homicide unless there was another reasonable explanation of the crime. State v. Captville, 448 So.2d 676 (La. 1984). The account given by the state's witnesses negated any suggestion the defendant might have acted in self-defense or in instinctive reaction to an attack by Clark. State v. Lynch, 436 So.2d 567 (La.1983).
[4] The crime in the instant case was not nearly so egregious as the one in State v. Byrne, 483 So.2d 564 (La.1986). The defendant in that case hit his girlfriend-victim twelve to fifteen times on the head with a ball peen hammer. Each blow caused the victim's head to bounce off the concrete floor, crushing her skull. The victim was still alive during the course of the attack and was conscious when receiving at least some of the blows. This Court agreed with the jury finding that the crime was committed in an especially heinous, atrocious and cruel manner.

The Court in State v. Loyd, 489 So.2d 898 (La.1986), held the murder of the three-year-old victim was commited in an especially heinous, atrocious and cruel manner. Loyd kidnapped the child, raped her both vaginally and rectally, inflicted severe injuries in a prolonged attack and then drowned her by holding her head under water.