669 So.2d 364 (1996)
STATE of Louisiana
v.
Feltus TAYLOR.
No. 93-KA-2201.
Supreme Court of Louisiana.
February 28, 1996.
Rehearing Denied March 29, 1996.
*366 James Edgar Boren, Baton Rouge, David William Price, John Holdridge, New Orleans, for Applicant.
Richard Phillip Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, John Warren Sinquefield, Lori Theresa Lewis Nunn, Gwendolyn Kay Brown, Baton Rouge, for Defendant.
VICTORY, Justice.[1]
Feltus Taylor was indicted by the grand jury for the first degree murder of Donna Ponsano, in violation of La.R.S. 14:30. After trial, the jury found the defendant guilty as charged, and unanimously recommended a death sentence. The trial court sentenced the defendant to death in accordance with the jury's recommendation. This is a direct appeal from that conviction and sentence. La. Const. art. V, § 5(D)(2); La.Code Crim.P. art. 912.1(A). The defendant raises 339 assignments of error[2] for reversal of his conviction and sentence.[3] We find no reversible error, and affirm the conviction and sentence.

FACTS
On the morning of March 27, 1991, the victim, Donna Ponsano, was working as a cook at Cajun's Fabulous Fried Chicken restaurant on Florida Boulevard in Baton Rouge. At approximately 7:00 a.m., Keith Clark, the restaurant's manager, arrived to assist Ponsano in opening for business. After tending to morning chores in the rear of the restaurant, Clark returned to the front and noticed the defendant at the front door knocking. The defendant was a former employee of the restaurant whom Clark had hired approximately six months earlier. Although he had been fired by Clark about two weeks previously for poor performance, he and Clark were still friendly.
Clark opened the door for the defendant and allowed him to enter the restaurant. At this time, the defendant, who was experiencing financial problems, asked Clark to rehire him. Clark refused, but assisted the defendant in searching for another job by giving him money to buy a newspaper and sitting with him in a restaurant booth to review classified job advertisements. Clark found that a local Popeye's restaurant was seeking a cook, and called to recommend the defendant for the job. He made a 9:00 a.m. appointment with the Popeye's manager responsible for hiring, and intended to accompany the defendant to discuss his qualifications.
While waiting for the time of the appointment, Clark continued with his morning routine, and the defendant helped by sweeping the dining area of the restaurant. As Clark was placing money into the cash registers, the defendant decided that robbery was the solution to his financial problems. He exited the restaurant to retrieve a .22 caliber handgun and handcuffs from his car which was parked in front.
Upon reentering the restaurant, the defendant grabbed Ponsano, held the gun to her head and demanded that Clark open the restaurant's floor safe which was located in a storeroom towards the rear of the building. Initially Clark refused, but complied after the defendant threatened to shoot Ponsano in the head. As the three of them went to the back of the restaurant, Clark tried to escape through a rear entry door. However, his attempts were unsuccessful because the door was locked. The defendant then handcuffed Clark and Ponsano together. Clark opened the safe, and gave the defendant its contents, approximately $800.00.
Clark tried to convince the defendant not to continue with the robbery, but he refused, *367 saying that his financial problems were too serious and that his car payment of $134.00 was due. Clark responded by offering to loan or give the defendant a personal check to pay the note. The defendant refused the offer, and instructed Clark not to inform the police about the robbery. After Clark told the defendant that he would not lie to the police, the defendant again asked Clark to rehire him. Ponsano expressed her opposition to rehiring the defendant, and Clark agreed. The defendant then shot Ponsano, hitting her five times in the head and upper forearm. After emptying the gun, he exited the room, reloaded and returned to shoot Clark in the head. He then emptied the cash register of approximately $580.00, exited through the front door, got into his car and drove away.
Earlier, while the defendant was herding Clark and Ponsano to the back of the restaurant, another employee of Cajun's, Viola Kaglear, arrived between 8:00 and 8:30 a.m. to begin her workday. She recognized the defendant's car in the front of the building. When no one responded to her knocking on the front door, Kaglear looked into the front windows and saw the defendant and Clark going into the storeroom. She waited a few minutes, proceeded to the rear of the building, and looked through a two-way peep hole in the back door where she saw the defendant exit and return to the storeroom. Shortly thereafter, she heard gunshots and ran to a neighboring Frostop restaurant where she alerted Josephine Hookfin, a Frostop employee, and William H. Johns, a food salesman, of the shooting. Hookfin immediately called 911. During the 911 telephone call, the defendant exited the restaurant, and got into his car. As the defendant drove away, Johns was able to read the automobile's license plate number, and relayed it to Hookfin and Kaglear, who gave it to the 911 operator.
When the police and emergency medical personnel arrived at the scene they found Ponsano and Clark lying in the storeroom handcuffed together, each with multiple gunshot wounds to the head. Ponsano died two days later, after treatment and surgery in a nearby hospital. Clark survived, but suffers with paralysis and minor brain damage.
At approximately 10:00 p.m. on the day of the shooting, police arrested the defendant near his apartment for attempted first degree murder and armed robbery. Thereafter, he confessed and led the police to the stolen money, which was hidden in a field not far from his apartment. The defendant informed the police that he had thrown the murder weapon into the Mississippi River.
After Ponsano died two days later, the defendant was charged with first degree murder and armed robbery. At trial, the defendant conceded guilt, and the jury found him guilty. After a four-day penalty phase hearing, the jury recommended a death sentence, finding four aggravating circumstances: (1) that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery; (2) that the defendant knowingly created a risk of death or great bodily harm to more than one person; (3) that the defendant had been previously convicted of an unrelated armed robbery; and (4) that the offense was committed in an especially heinous, atrocious and cruel manner.

DISCUSSION

SCOPE OF REVIEW
As in most capital cases, the defendant asserts numerous assignments of error which were not objected to during the trial. In State v. Smith, 554 So.2d 676 (La.1989), this Court enunciated a new and expanded rule regarding consideration of alleged errors that are not contemporaneously objected to in capital cases. La.Code Crim.P. art. 841(A). A narrow majority of the Court held that in death penalty cases it would notice all possible errors occurring during both the guilt and sentencing phases, even if they were not properly raised. Smith, 554 So.2d at 678.
Smith changed the Court's long-standing policy regarding the scope of review in death cases. Prior to Smith, only those unobjected to errors occurring during the sentencing phase of the trial were reviewed by the Court. This practice was based upon the *368 Court's statutory obligation to review every death sentence for excessiveness by examining the record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation. La.Code Crim.P. art. 905.9; La.Sup.Ct.R. 28, § 1; State v. Lindsey, 404 So.2d 466, 482-83 (La. 1981), on original hearing, citing State v. Berry, 391 So.2d 406 (La.1980), on original hearing; and State v. Sonnier, 379 So.2d 1336 (La.1980), on rehearing.
One of the Court's primary reasons for expanding the scope of review in capital cases was "efficiency." Specifically, the Court was concerned that failure to review unobjected to errors occurring during the guilt phase would add "to the burgeoning delays of postconviction proceedings in state and federal courts." Smith, 554 So.2d at 678. While this concern may have been well-placed when Smith was decided, it has been minimized by subsequent events.
Since its decision in Smith, the Court has adopted La.Sup.Ct.R. XXXI, which established the Louisiana Indigent Defender Board ("LIDB") and which requires, in capital cases, the appointment of at least two attorneys to represent indigent defendantsone trial lead counsel and one trial associate counselboth of whom must be "certified" in accordance with the rules and standards of the LIDB. According to Chapter 7 of the LIDB's Standards on Indigent Defense, trial lead counsel must meet the following minimum standards to be certified:
(A) Be an experienced and active trial practitioner with at least five years of litigation experience;
(B) Have prior experience as lead counsel in no fewer than nine jury trials tried to completion; of these nine jury trials, at least five must have involved felonies or two must have involved the charge of murder; and
(C) Have prior experience as lead counsel or associate counsel in at least one case in which the death penalty was sought and was tried through the penalty phase or have prior experience as lead counsel or associate counsel in at least two cases in which the death penalty was sought and where, although resolved prior to trial or at the guilt phase, a thorough investigation was performed for a potential penalty phase.
Standard 7-2.1, Louisiana Standards on Indigent Defense.
In similar fashion, trial associate counsel must meet the following minimum standards to be certified:
(A) Be an experienced and active trial or appellate practitioner with at least three years of litigation experience; and
(B) Have prior experience as lead counsel in no fewer than three felony jury trials which were tried to completion, including service as lead or associate counsel in at least one homicide trial.
Standard 7-3.1, Louisiana Standards on Indigent Defense.[4]
These Standards will apply in many capital cases since numerous capital defendants are indigent. With able counsel at the helm, most significant errors occurring during the guilt phase should be contemporaneously objected to as required by La.Code Crim.P. art. 841(A). Thus, the concern expressed in Smith, that failure to consider unobjected to errors occurring during the guilt phase would result in undue delay in the form of ineffective assistance of counsel claims during postconviction relief proceedings, is lessened in most cases.
Additionally, we note that the contemporaneous objection rule contained in La.Code Crim.P. art. 841(A) and La.Code Evid. art. 103, does not frustrate the goal of efficiency. Instead, it is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings. State *369 v. Arvie, 505 So.2d 44, 47 (La.1987); State v. Mart, 419 So.2d 1216, 1218 (La.1982); State v. Smith, 339 So.2d 829, 834 (La.1976), cert. denied, 430 U.S. 986, 97 S.Ct. 1685, 52 L.Ed.2d 381 (1977).
For these reasons, we abandon the expanded scope of review in capital cases established in Smith and its progeny, overrule them and return to previously existing law. This Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not.

VICTIM IMPACT EVIDENCE
The defendant contends that the trial court erred by allowing inappropriate and excessive victim impact evidence to be admitted during the guilt and penalty phases of the trial.[5] Specifically, the defendant complains that: (1) the trial court erred by allowing Ponsano's survivors to give their opinions about the crime, the defendant and the appropriate sentence; (2) the trial court erred by admitting victim impact evidence regarding Ponsano which went beyond the limits of admissibility established by this Court in State v. Bernard, 608 So.2d 966 (La.1992);[6] (3) the trial court erred by admitting victim impact evidence regarding Clark; (4) his due process rights were violated because he did not receive adequate notice of the state's intent to use victim impact evidence regarding Clark; and (5) the prosecutor made improper arguments and comments on the victim impact evidence during the trial.
Standards for admissibility of victim impact testimony in capital trials have varied greatly in recent years. In Booth v. Maryland, 482 U.S. 496, 504, 107 S.Ct. 2529, 2534, 96 L.Ed.2d 440 (1987), the Supreme Court held that introduction of victim impact evidence at the penalty phase of a capital trial violates a defendant's Eighth Amendment rights because the evidence "may be wholly unrelated to blameworthiness of a particular defendant," and may divert the capital sentencer's attention from relevant information about the crime and the defendant's background and record. The Court noted that although victim impact statements are impermissible at the sentencing phase of a capital case, they may be relevant in other contexts, such as when the evidence relates to the circumstances of the crime or rebuts a defense argument. Booth, 482 U.S. at 507 n. 10, 107 S.Ct. at 2535 n. 10.
In South Carolina v. Gathers, 490 U.S. 805, 811-12, 109 S.Ct. 2207, 2211, 104 L.Ed.2d 876 (1989), the Supreme Court reaffirmed Booth, holding that the introduction of evidence regarding a victim's personal characteristics violated the Eighth Amendment because the evidence bore no relevance to the defendant's moral culpability and did not relate to the circumstances of the crime. The Court expressed its concern that "[a]llowing the jury to rely on [victim impact evidence] could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill." South Carolina, 490 U.S. at 811-12, 109 S.Ct. at 2210-11, citing Booth, 482 U.S. at 505, 107 S.Ct. at 2534.
In 1991, the Supreme Court changed its position on the issue of victim impact evidence with its decision in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Therein, the Court found that:
If the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.
*370 Payne, 501 U.S. at 827, 111 S.Ct. at 2609. Thus, Payne allows, within the general bounds of admissibility, the introduction of two categories of victim impact evidence: (1) information revealing the individuality of the victim; and (2) information revealing the impact of the crime on the victim's survivors. Payne, 501 U.S. at 834, 111 S.Ct. at 2614 (Souter, J., concurring). However, Payne left undisturbed the rule that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Payne, 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2. See also Payne, 501 U.S. at 835 n. 1, 111 S.Ct. at 2614 n. 1 (Souter, J., concurring) (Payne "presents no challenge to the Court's [earlier] holding[s] that a sentencing authority should not receive ... information concerning a victim's family members' characterizations of and opinions about the crime, the defendant, and the appropriate sentence.").
This Court has applied and followed Payne. State v. Scales, 93-2003 (La. 5/22/95), 655 So.2d 1326, cert. denied, ___ U.S. ___, 116 S.Ct. 716, 133 L.Ed.2d 670; State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190, cert. denied, ___ U.S. ___, 115 S.Ct. 2252, 132 L.Ed.2d 260; and State v. Bernard, supra. In our most detailed treatment of the subject, we held that:
[S]ome evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime.
Bernard, 608 So.2d at 972.
However, we went on to caution that:
[I]ntroduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision. Whether or not particular evidence renders a hearing so fundamentally unfair as to amount to a due process violation must be determined on a case-by-case basis.
Bernard, 608 So.2d at 972. We also highlighted the Supreme Court's consistent holding that, "[e]vidence of the victim's survivors' opinions about the crime and the murderer is clearly irrelevant to any issue in a capital sentencing hearing." Bernard, 608 So.2d at 970.[7]

Survivors' Opinions of the Defendant, the Crime and the Sentence
During the sentencing phase of the trial, the state called three victim impact witnesses, namely: (1) Ponsano's sister, Lisa Reeves; (2) her niece, Wendy Reeves; and (3) her fiancé, James Shatzel. Each of them testified as to Ponsano's good characteristics, and stated that they were deeply affected by her death. At the conclusion of questioning these witnesses, the state asked each whether *371 they had any sympathy for the defendant and received a negative reply.
The defendant argues that his death sentence should be reversed because these statements constitute indirect characterizations and opinions about the crime, the defendant and the appropriate sentence, and fall beyond the scope of permissible victim impact testimony under both Payne and Bernard.[8]
Assuming, but not deciding, that this testimony exceeded the boundaries set forth in Bernard, any possible error was harmless. An error is harmless if the verdict rendered was surely unattributable to the error. La. Code Crim.P. art. 921; State v. Johnson, 94-1379, p. 14 (La. 11/27/95), 664 So.2d 94, 100, citing Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). This Court has previously applied the harmless error standard to a victim impact witnesses' comments on the appropriateness of the death penalty. State v. Rushing, 464 So.2d 268 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986).
The evidence at issue was presented during the first day of a five day penalty hearing, during which time the defendant introduced a vast amount of mitigation evidence, including the testimony of 20 witnesses: 14 lay witnesses, including the defendant; a paralegal who calculated the number of hours the defendant worked; two clinical social workers; a clinical psychologist; a psychiatrist; and C. Paul Phelps, a social worker and the former Secretary of the Department of Public Safety and Corrections. The defense also introduced letters that the defendant wrote to his grandmother, and the defendant's school, work, and mental health records.
In contrast, the entire victim impact testimony of which the defense complains was presented by the state on the first day of the hearing, lasted only a very short time, and takes up only 10 pages of the 793 page penalty hearing transcript. Any possible prejudicial effect created by the admission of this evidence was diluted by the defendant's presentation of a lengthy and detailed mitigation case.
Furthermore, surely the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one. That the victim's survivors might have little or no sympathy for the defendant certainly would come as no surprise to a member of the jury. During voir dire, both the state and the defense questioned prospective jurors about their ability to remain impartial after listening to emotional victim impact testimony. Each of the jurors stated that they would afford such evidence appropriate weight and would not render a decision based solely upon sympathy for the victim and her survivors.
Finally, at the close of the penalty phase, the trial court instructed the jury on the weight to be afforded this victim impact evidence:
Ladies and gentlemen, you heard testimony in this case from persons who are relatives of the victim. These persons are called victim impact witnesses. Evidence adduced from these witnesses is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question. These witnesses, however, are not called into court for the purpose of deciding the penalty in the case. You, the jurors, are the ones, who, in law, must bare [sic] the responsibility of deciding the penalty to be received by the defendant. You're not to be influenced by sympathy, passion, prejudice, or public opinion. You are expected to reach a just verdict.
We find that any possible error created by the admission of this victim impact evidence was harmless, and does not warrant reversal of the sentence.

Detailed Victim Impact Evidence Regarding the Victim's Good Qualities
In Bernard, we stated that victim impact evidence which goes beyond the purpose of showing the victim's individual identity and to verify the existence of survivors reasonably expected to grieve and suffer because of *372 the murder treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision. The defendant claims that his conviction and sentence should be reversed because the state was erroneously allowed to introduce victim impact evidence beyond this limitation.
As discussed above, the state called three of the murder victim's survivors at the sentencing phase.[9] Each testified briefly. Lisa Reeves, the victim's younger sister, stated that illness during Ponsano's high school years prevented her from graduating and from bearing children. She recalled that Ponsano loved children very much, and that her infertility had a dramatic effect upon her life. According to Reeves, Ponsano was a giving person who took care of others, including Reeves' oldest daughter, Wendy, who looked upon Ponsano as a mother. As to the effect of Ponsano's death upon her life, Reeves testified that she has suffered, and that she misses her sister very much.
Wendy Reeves, the victim's 13-year-old niece, stated that she was very close to Ponsano, and called her "mother." She testified that they spent almost every day together, and that she discussed her problems with Ponsano. Wendy stated that she missed her aunt very much, and that she felt like a part of her life was taken away when Ponsano died.
James Shatzel, the victim's fiancé, testified that Ponsano was a great person. He stated that she was the best thing that he ever had, and that he would probably never have another like her. He said that Ponsano treated him lovingly, and cared deeply for his two children from a previous marriage. He stated that he loved her very much, and that he and his children miss her.
Shatzel testified that he found out about the shooting while working at his job at Capital City Press. He recalled reading about the events as they came off the press, and that this was not a pleasant way to find out that his fiancé had been shot. Shatzel went immediately to the hospital, and stayed there until Ponsano was pronounced dead two days later. Shatzel stated that if he had one more chance to talk to Ponsano he would tell her that he was sorry that their plans were "thrown out the window," and that he wishes it could have been him instead of her.
Under Bernard, "[w]hether or not particular evidence renders a hearing so fundamentally unfair as to amount to a due process violation must be determined on a case-by-case basis." Bernard, 608 So.2d at 972. Under the facts of this case, we do not consider this testimony beyond the scope of admissible victim impact evidence. It did not contain "detailed descriptions" of Ponsano's good qualities or of the survivor's sufferings as cautioned against in Bernard. Rather, each of the three witnesses simply gave general statements about Ponsano's virtuous nature, and her love for children. No specific examples were elicited, and the state did not dwell upon this topic. See and compare, State v. Scales, supra. Such evidence is admissible under Bernard to show that the defendant should have known that the victim was a unique person. After all, the defendant knew Ponsano, having worked side-by-side with her at Cajun's for almost six months.
Additionally, each of the three witnesses gave general statements dealing with the impact of Ponsano's death upon their lives. All testified that they missed her very much, and that they were deeply affected. Such responses are to be expected under the circumstances. The state did not question these witnesses about particular aspects of their grief, and the witnesses did not give detailed responses to general questions. See and compare, State v. Scales, supra. General evidence of the impact of the murder upon the victim's survivors is admissible under Bernard.
This argument lacks merit.

*373 Victim Impact Evidence Regarding Clark

The defendant also argues that his conviction and sentence should be reversed because the state elicited inadmissible victim impact testimony regarding Clark during the guilt phase of the trial. In a related argument, he contends that the error was compounded when the state reintroduced all of the evidence from the guilt phase at the sentencing phase without complying with the notice requirements set forth in Bernard.
During the guilt phase, the prosecution elicited testimony from a series of witnesses regarding Clark's injuries. Clark told of his wounds and the impairment caused thereby. His wife testified as to how he looked after the shooting, of her feeling at the time of the shootings that she would never see him again, and of how Clark became sick with pneumonia months after the shooting. Clark's father testified as to how Clark appeared the day after the shooting, how his son became sick with pneumonia, and how he still required constant care. Finally, the state presented stipulated testimony from Clark's doctor regarding the permanent paralysis and brain damage caused by the shooting.
As the state elicited this testimony, the defense lodged an objection arguing that victim impact evidence regarding Clark was inadmissible. The trial court ruled that it would allow some evidence regarding the injuries sustained by Clark to prove the "great bodily harm" element of first degree murder.
During the penalty phase of the trial, defense counsel renewed its objection to the admissibility of victim impact evidence. Again, the trial court denied the request, stating that it would allow victim impact evidence as to Ponsano only. At the close of its presentation of evidence during the penalty phase the state reintroduced all of the evidence brought forth during the guilt phase, which included the evidence regarding Clark's injuries. La.Code Crim.P. art. 905.2(A).
We find that the testimony about Clark's injuries elicited during the guilt phase falls within the bounds of admissibility for both guilt and sentencing phase testimony. As far as the guilt phase is concerned, the evidence related to a fact in issue under La. Code Evid. art. 401, namely, whether the defendant had the specific intent to inflict great bodily harm on more than one person, under La.R.S. 14:30(A)(3). Similarly, this evidence had the same value during the sentencing phase, that is to prove the aggravating circumstance that he knowingly created a risk of death or great bodily harm to more than one person. La.Code Crim.P. art. 905.4(A)(4).
Furthermore, this evidence was relevant as it had some tendency to make the existence of the alleged facts more probable or less probable. La.Code Evid. art. 401. Under the applicable abuse of discretion standard, it was more probative than prejudicial, and thus passes the balancing test of La. Code Evid. art. 403. State v. Langlois, 573 So.2d 1110 (La.1991); State v. Kahey, 436 So.2d 475 (La.1983).
This argument lacks merit.
The defendant's subsidiary argument, that the state introduced this evidence at the penalty phase without the notice required by Bernard, 608 So.2d at 972-73, is likewise without merit. A pretrial motion filed by the defendant requesting the exclusion of victim impact evidence indicates that the state notified defense counsel of its intent to use victim impact evidence. Bernard does not require separate notices for both phases of the trial.
This argument lacks merit.

Prosecutorial Argument and Comments Regarding Victim Impact Evidence
The defendant argues that his conviction and sentence should be reversed due to improper arguments and comments about the victim impact evidence made by the prosecutor during various stages of the trial.
First, he complains about the following statement allegedly made by the prosecutor during closing arguments at the sentencing phase: "those people out there ... want [Feltus] to get [the death penalty]." Our review of the prosecutor's entire closing argument reveals that no such comment was made. In fact, the record reference given by the defendant in his brief reveals that defense *374 counsel has simply misstated the following portion of the prosecutor's argument:
Feltus Taylor on the stand.... He was polite, he answered my questions, and he gave you an opinion. He knows what he did. He gave you an opinion. He said, in a sense, let me tell you ladies and gentlemen of the jury, for what I did, the death penalty is very well justified. I don't blame those people out there for wanting me to get it. In a sense, I don't blame the prosecutor. And I asked him, point blank, if this jury gives you the death penalty that I ask for, would you have anyone to blame but yourself? And he said, no. Because he knows what he did. (Emphasis added.)
This argument is without merit.
Second, the defendant complains of several additional comments made by the prosecutor in the following portion of his closing argument at the sentencing phase:
They put on a lot of witnesses, sympathy witnesses. Used to, under the law, in the death penalty phase, the only thing you could hear would be people begging for the defendant's life, saying good things about him. The law changed very recently. And I was allowed to put on victim impact testimony. I put on three witnesses, Lisa Reeves, who I thought was a very moving witness that showed her grief over the loss of her sister; told you something about her. Her daughter, who took one look at the defendant and openly displayed hostility. And, of course, Jimmy Shatzel, who's engaged to Donna Ponsano, and told you something about her, something about their lives, something about the grief, something about the impact that a person's death has on people. And that's why I say, when you get somebody down and you handcuff them together, and you kill one of them, and you put another in a wheelchair, it doesn't end there. Because the grief of the loss of a loved one will live with these people til they die. They will suffer, they will suffer a loss, they will have problems, and that's one of the reasons that I can stand here with my head high, and tell you without any reservations whatsoever, that the only correct penalty in this case is death. That's part of it. Not because of sympathy, not because they cried up here, but because of the effect that murder has upon the lives of other people, living people. And that was put in the law. You didn't just hear the sympathy witnesses begging for the defendant's life. But they put on some good ones. I'll say something about him, he has friends, he has people that loves him, two of the most delightful ladies I've ever seen in my life, his grandmother, Henrietta, and Willie Mae Brown, two elderly delightful ladies that love him, that in a sense, begged for his life. Some other people, parent, or younger ladies that talked to him and all, these are sympathy witnesses. But you know, there comes a time when you leave your parents, you leave your grandmother, you're thirty years old, and you stand on your own. I'm sorry that the death penalty would hurt these people [referring to the defendant's family and friends], but the fact that other people may get hurt, does not, to me, justify letting him out of the death penalty for what he did on that morning. And for the pain and the suffering that will live until Keith Clark dies, and will live with Donna Ponsano's people until they die. (Emphasis added.)
Initially, the defendant argues that the prosecutor's comment that the victim's survivors had "cried up there" was improper. In another argument, the defendant complains that the prosecutor improperly discussed the testimony of the victim's survivors. The defendant also contends that prosecutorial comments about Clark's injuries and suffering were improper.
This Court has stated, as a general matter, that a prosecutor retains considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La. 1981). Even when we have found that a prosecutor has exceeded that latitude, the Court has often criticized the improper arguments without finding that they constitute reversible error. See, e.g., Byrne, supra; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Messer, 408 So.2d 1354 (La.1982). *375 Specifically, this Court will not overturn a guilty verdict on the basis of improper argument unless we are "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." State v. Bates, 495 So.2d 1262, 1273 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357.
After reviewing these statements, in context and alone, we are not firmly convinced that the jury was influenced by them and that they contributed to the verdict. These arguments are without merit.
Third, the defendant complains about the following two prosecutorial comments made about Clark during the state's opening statement at the guilt phase:
[O]n the day of the crime, March 27th, 1991, Keith Clark was thirty-four years old. He was married. He had two children. He had worked at a number of places in Baton Rouge. He had worked at Hancock Bank. He had worked at the Village. He worked at Pancho's. He had worked in the food service industry mostly except that he worked at a bank, that he was in good health.
* * * * * *
We'll show you that Keith Clark, they'll tell you that he probably should be dead, that he is aI won't say a walking miracle, but it is a miracle that he's here. We'll show you that he's had to go through months of physical therapy in Nu-Medico and other places, that now he lives and his parents help take care of him while his wife works and tries to support their children. We'll show you that he's an upbeat man and tends to overcome his now permanent handicaps.
The defendant argues that these comments were improper because they inappropriately place the focus upon Clark, who was not the murder victim in this case. We conclude that these comments do not violate the wide latitude given to prosecutors, and note that defense counsel failed to object to the complained of comments as required by La.Code Crim.P. art. 841. This argument is without merit.
Fourth, the defendant complains that the prosecutor gave detailed descriptions of the victim during his opening statement at the guilt phase and during his closing statement at the penalty phase. According to the defendant, this, in combination with the following comment made during closing arguments at the sentencing phase, was prejudicial and improper:
He's the person that put you in the position where to do anything else would deprecate this crime. It would deprecate the pain and suffering of these victims. It would deprecate their memory. It would be a shame and a disgrace, and I ask you not to do it. I ask you to come in this court, please, stand tall, don't apologize. Tell him we've considered everything. We've considered your mitigating circumstances, and for you, Mr. Taylor, for what you've did, yourself, for what you made yourself deserve, we give you the death penalty. It's the right thing to do. It's a decision that you'll never look back on. And I tell you, my opinion, and I'll respect whatever you do, but anything else would be a disgrace. (Emphasis added.)
The emphasized portion of this argument treads dangerously close to reversible error, and we caution this prosecutor to refrain from such conduct in the future. Nevertheless, we find that this statement does not warrant reversal of the sentence under current harmless error standards. Johnson, 94-1379 at p. 14, 664 So.2d at 100, citing Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Before this Court will reverse a conviction or sentence on the ground of improper closing argument, it must be thoroughly convinced that the remarks influenced the jury and contributed to the verdict. Bates, 495 So.2d at 1273 (La.1986); Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357.
In light of the deference given to the good sensibility and fairmindedness of juries, State v. Martin, supra, and after viewing the comments as a whole,[10] we find that the statement *376 did not influence the jury and contribute to the verdict. See and compare, State v. Martin, supra; State v. Bates, supra; and State v. Monroe, 397 So.2d 1258, 1270-71 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983). We find no reversible error.

PEREMPTORY CHALLENGES
The defendant claims that the trial court erred by refusing to allow defense counsel to exercise peremptory challenges after the state and defense had provisionally accepted individual jurors under La.Code Crim.P. art. 788, but before the court swore the jury panel as a whole under La.Code Crim.P. art. 790.[11]
Under La.Code Crim.P. art. 788(A), a prospective juror is first tendered to the state for acceptance or challenge after he is examined by both sides. If the state accepts the juror, he is then tendered to the defendant for acceptance or challenge.
However, La.Code Crim.P. art. 795(B)(1), provides that peremptory challenges shall be exercised prior to the swearing of the jury panel. Since the jury panel is not sworn until all individual jurors and alternates have been selected, under La.Code Crim.P. art. 790, peremptory challenges may be exercised even after tendering of jurors under subsection (A) of Article 788. In other words, peremptory challenges are exercisable at any time before the jury panel is sworn. State v. Watts, 579 So.2d 931 (La. 1991) ("A juror temporarily accepted and sworn in accordance with LSA C.Cr.P. Art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with LSA C.Cr.P. Art. 790. LSA C.Cr.P. Art. 795(b)(1).").
Prior to the commencement of voir dire, the defense, the state, and the trial court agreed to a system of simultaneous peremptory challenges. La.Code Crim.P. art. 788(B).[12] They further agreed to defer the swearing of the jurors and to utilize the procedure envisioned by La.Code Crim.P. arts. 790 and 795(B)(1), which they referred to as "back striking."
However, during voir dire confusion erupted as to the manner in which peremptory challenges were to be exercised. After the first panel of twelve veniremen was examined, the state and the defense were called upon to simultaneously exercise any peremptory challenges upon the remaining five jurors who had not been previously excused for cause. The state exercised three peremptory challenges, and the defense exercised none, noting on its challenge sheet that it had "none at this time." The state then objected to the defense's failure to exercise any peremptory challenges, claiming that the defense was strategically holding all of its peremptory challenges until the end of voir dire. According to the state, this was unfair because it allowed the defense to avoid expending its challenges upon prospective jurors that the state also decided to peremptorily challenge, and because reserving challenges to the end of voir dire defeated the purpose behind the simultaneous challenge system.
The trial court agreed with the state, and ruled that it would not follow the pure "back strike" system of peremptory challenges. Instead, both the state and the defense were required to exercise their peremptory challenges at the conclusion of examination of *377 each 12 member panel. Defense counsel was then allowed to reconsider the two remaining prospective jurors on the first panel, whereupon, the defense exercised one peremptory challenge.
In accordance with the trial court's ruling, each of the remaining jury panels were examined and prospective jurors that were not excused for cause were then presented for peremptory challenges which were exercised simultaneously. When jury selection concluded and 12 jurors had been selected, the defense had four peremptory challenges remaining. Before the panel was sworn under La.Code Crim.P. art. 790, the defense renewed its objection on the "back strikes" issue, noting that it wished to exercise its remaining peremptory challenges. The trial court denied the defendant's request, and the jury was sworn.[13]
The defendant claims that the trial court's refusal to allow him to exercise remaining peremptory challenges immediately before the jury panel was sworn violates the law as interpreted in Watts. We agree that Watts was violated, but hold that the error was harmless under the circumstances of this case.
Under La. Const. art. I § 17, the defendant has the right to full voir dire examination of prospective jurors, and to peremptory challenges. The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause, and to secure information for an intelligent exercise of peremptory challenges. State v. Williams, 457 So.2d 610, 613 (La.1984). The trial court must give "wide latitude" to the defendant. State v. Hall, 616 So.2d 664, 669 (La.1993); State v. Williams, supra. In analyzing whether the voir dire afforded a defendant was sufficiently full, the court examines the voir dire as a whole. State v. Hall, supra.
This record shows that the defendant had ample opportunity to examine prospective jurors, to challenge them for cause, and to peremptorily challenge them. Voir dire continued over 11 days. Some 70 veniremen underwent sequestered voir dire and many were questioned in detail. The trial court cured the initial confusion on the "back strike" issue by allowing the defense a provisional sort of "back strike" after it failed to exercise any peremptory challenges on the first panel. All parties subsequently understood the ground rules for voir dire, and exercised peremptory challenges upon prospective jurors that remained after examination and the exercise of cause challenges. In the end, both sides had peremptory challenges leftthe defense had four, and the state had six.
During oral argument in this Court, defense counsel contended that the trial court's refusal to allow "back strikes" prejudiced the defendant because: (1) defense counsel would have peremptorily challenged juror JoAnn Broussard if it had been allowed to "back strike;" and (2) all of the other complaints regarding challenges are not exercisable now because the defense did not exercise all 12 of its challenges.
We find no merit in defendant's claim regarding juror Broussard. She was a member of panel five which was the last panel of 12 that was examined, and from which the last three jurors were selected. After each of the members of panel five were examined, only five remained (i.e., had not been excused for cause). Juror Broussard was one of them. The trial court presented these jurors to the defense and to the state for the exercise of peremptory challenges. The defense, who had five peremptory challenges remaining, exercised only one; and the state, who had seven peremptory challenges remaining, exercised only one. Neither party peremptorily challenged juror Broussard, and she served. At this point, a panel of 12 jurors had been accepted, and except for the selection of alternates jury selection was complete.
The defense had sufficient opportunity to challenge juror Broussard. This was the last *378 panel that was examined. The defense, with five remaining peremptory challenges, could have excused juror Broussard with the other prospective juror that it excused. If the defense had excused her, a new panel of 12 would have been examined (panel six) for selection of the final juror. The defense would have been adequately protected because it would have had three peremptory challenges remaining. Under these circumstances, we find no prejudice to the defendant.
Likewise, we find no merit in his contention that prejudice resulted because all of the other complaints regarding challenges are not valid since he failed to exhaust all 12 challenges. The trial court's refusal to allow the parties to "back strike" prospective jurors did not prevent the defendant from utilizing all of his challenges during the jury selection process. The defendant, who had five peremptory challenges left, could have used some earlier in jury selection or even all of them on panel five.
We conclude that the voir dire in the instant case more than adequately fulfilled the purposes of La. Const. art. I, § 17. That being the case, we find that the verdict rendered was surely unattributable to any error that occurred in not allowing "back striking," and so qualifies as harmless. La.Code Crim.P. art. 921; Johnson, supra. This argument lacks merit.

MOTION TO SUPPRESS DEFENDANT'S SECOND CONFESSION
The defendant argues, that the trial court erred in denying his motion to suppress his second confession.[14]
The following evidence was adduced at the suppression hearing. The defendant was arrested at approximately 10:00 p.m. on the day the shooting (March 27, 1991), by Baton Rouge Narcotics Officers, Frank Caruso and Thomas Smith, while they were working extra detail assisting the armed robbery detectives. He was charged with attempted first degree murder and armed robbery. The officers orally Mirandized the defendant when they arrested him, and he did not request to speak with an attorney at that time. The officers took the defendant to the station. They then telephoned Darryl Rice, the armed robbery detective assigned to the case, to inform him of the arrest. Rice, who was off-duty, advised that he would arrive shortly.
During the interim, Officers Caruso advised the defendant of his rights on a written Miranda form. Officer Caruso read the form to the defendant. However, the defendant refused to sign the waiver acknowledgment because he feared that this would be an admission of guilt. Officer Caruso then read the form to the defendant numerous times and attempted to explain to him that signing it would not constitute an admission of guilt. At this point, Officer Caruso asked the defendant if he wished for him to check the box on the form which read, "Prefers to speak with an attorney before making decision." The defendant nodded affirmatively. Officer Caruso testified that he checked this box because he thought it was in the defendant's best interest.
Officer Caruso then terminated the session, and turned the defendant over to Detective Rice when he arrived at about 11:00 p.m. Officer Caruso did not inform Detective Rice of the waiver form. In fact, Detective Rice did not become aware of the rights form until the next morning.
After Detective Rice's partner arrived, he advised the defendant of his rights using a second written Miranda form. Detective Rice read each right separately, asked the defendant if he understood, and checked each right after the defendant acknowledged his comprehension. The defendant did not indicate that he had previously requested a lawyer, and did not make a separate request for representation. When Detective Rice asked the defendant to sign the waiver acknowledgment blank on the form, the defendant hesitated because he thought that this was an admission of guilt. However, he did sign the form after Detective Rice explained the procedure to him several times.
*379 The defendant then confessed to the shooting, and told the officers that he had thrown the gun into the Mississippi River. He also helped them search for the stolen money which he had hidden in an empty lot near his apartment. However, it was too muddy and dark on that evening, and they discontinued the search until the next morning.
On the morning of March 28, 1991, the defendant was arraigned, bond was set and the Public Defender's Office was appointed to represent him. The same morning, Detective Rice went to the jail to take the defendant to look for the money. At that time, a letter from the defendant's attorney was presented to Detective Rice advising that the defendant should not speak to law enforcement officers without consulting his attorney. Detective Rice left without discussing the case with the defendant. The police discovered the money later that morning in the location described by the defendant without further assistance from him.
On March 29, 1991, Ponsano died and Detective Rice went to the jail to upgrade the charges to first degree murder. Again, the defendant was advised of his rights. The defendant then expressed his desire to speak to Detective Rice, whereupon the officer warned him that he could not speak with him and that it would be in his best interest to speak with his lawyer before making a statement. The defendant responded by stating that his lawyer could not help him, and that he wanted to make a statement. He then confessed to the killing.
The defense moved to suppress both confessions and the money, arguing that they were illegally obtained in violation of the defendant's state and federal constitutional rights. U.S. Const. amend. V and VI; La. Const. art. I, § 13. After a hearing, the trial court suppressed the first confession, finding that the defendant had invoked his right to counsel during his session with Detective Caruso. The trial court also suppressed the money finding that it was discovered as a direct result of the illegally obtained confession. The trial court declared the second confession admissible, finding that it was unsolicited.
The defendant argues that the trial court erred in finding the second confession admissible because it was taken in violation of his right to counsel under U.S. Const. amends. V and VI, and under La. Const. art. I, § 13.[15] Assuming, but not deciding, that the confession was inadmissible, any possible error was harmless.[16]
When viewed in light of the other testimony and evidence presented at the trial, it is clear that the jury's decision of guilt was surely unattributable to the error. Johnson, 94-1379 at p. 14, 664 So.2d at 100. The defendant admitted guilt during voir dire, and continually reminded the jury of this concession throughout the trial. Additionally, defense counsel elicited details from the first confession despite the fact that the trial court had suppressed it. Furthermore, one of the victims, Clark, who knew the defendant well, testified in detail about the crime and unequivocally implicated the defendant. Finally, Clark's testimony was corroborated by that of another Cajun's employee, Viola Kaglear. Kaglear also added testimony relating to events occurring after the shooting, namely, that she saw the defendant leaving the restaurant, and placing items into his car.
Under these circumstances, any possible error created by the admission of the second confession was harmless, and does not warrant reversal of the conviction and sentence.

SEQUESTRATION OF JURY MEMBERS
The defendant argues that the trial court violated La.Code Crim.P. art. 791(B) *380 by failing to sequester individual jurors after they had been accepted by both sides.[17]
At the time of this trial, La.Code Crim.P. art. 791(B) provided: "In capital cases, after each juror is sworn he shall be sequestered."[18] Under La.Code Crim.P. art. 788(A), an individual juror must be sworn immediately by the trial court after he has been accepted by the state and the defendant as a prospective juror. Once the jury selection process is completed, the entire jury panel is then sworn again by the trial court. La.Code Crim.P. art. 790.
It was anticipated by the state and the defense that jury selection in this case would be lengthy. In fact, as we have noted, it took 11 days. After the first panel of 12 prospective jurors was examined and just before both sides were about to exercise their peremptory challenges, the trial court made the following ruling, outside the prospective jurors' presence, regarding sequestration and swearing:
THE COURT: Before bringing the prospective jurors in, I want to state for the record that this court is proceeding in accordance with Article 788, Section B, with regards to jury selection utilizing the system of simultaneous exercise of challenges. The Court will further note that under Article 790 of the Code of Criminal Procedure, that jurors are to be sworn at one time once all of thewhen the selection of jurors and alternate jurors has been completed, and all issues properly raised under Article 795 have been resolved, the jurors shall be sworn together to try the case in a just and impartial manner. The Court in following the dictates of 790 and taking into consideration of 788 will allow counsel for the defense to exercise simultaneous challenges. However, the court will not swear these jurors in accordance with 790 in view of the fact that 791(B) dictates that each jurorafter each juror is sworn sequestration is to take place, so this would be, the court does not feel that if we select any persons from this panel that we could properly swear them because all jurors have not been selected. State do you have any objections to this procedure?
MR. SINQUEFIELD: No, your honor, I think it's a correct procedure.
THE COURT: Defense?
MS. JACKSON: No, sir.
MR. BOREN: No, your honor.
In accordance with this ruling, and without objection from either of the parties,[19] jurors that were not peremptorily challenged were not immediately sworn, as La.Code Crim.P. art. 788(A) requires. Instead, the trial court informed the individual jurors that they would be serving on the jury, and allowed them to return to their homes and to work until the trial began. The trial court admonished the individual jurors not to discuss the case with anyone, not to listen to news accounts about the case, and not to read written reports about the case during this time. Once jury selection was completed, the entire jury panel, and the two alternates, were then sworn in accordance with La.Code Crim.P. art. 790.
The defendant now complains that this procedure violated the swearing requirement of Article 791(B), and that his conviction and sentence should be reversed since the violation deprived him of due process, a fair trial and an impartial jury.
From the trial court's statement quoted above and the colloquy thereafter, it is evident that the state and the defense agreed to, or at least acquiesced in, the procedure proposed by the trial court, which effectively consisted of a waiver of the sequestration requirement by delaying the individual swearing requirement of Article 788(A). Historically, this Court has adhered to the principle that an accused may not consent to waive the sequestration requirement. State v. Luquette, 275 So.2d 396 (La.1973); State v. Craighead, 114 La. 84, 38 So. 28 (1905); *381 State v. Hornsby, 8 Rob. 554 (La.1844). The rationale behind this rule being that a "[d]efendant ought not to be placed in the position of having to consent, or perhaps prejudice the jury by withholding consent." State v. Luquette, 275 So.2d at 400, citing State v. Craighead, supra.
We find this jurisprudentially established rule unnecessary. This is reflected by recent legislative activity. During the 1995 legislative session, La.Code Crim.P. art. 791(B) was amended by La.Acts Nos. 1172, § 1 and 1277, § 1, to provide:
In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered. (Emphasis added.)
With this change, it is clear that a waiver of the sequestration requirement is now possible.
Since this amendment was enacted well after the defendant's trial, and did not become effective until August 15, 1995, it does not apply here. Nevertheless, it lends support to our conclusion that the jurisprudentially-created prohibition against waiver is no longer necessary. The concerns expressed in the cases cited above, namely, placing the defendant in a position of having to consent or prejudicing him in the eyes of the jury if he withholds consent, may be remedied by using the proper procedure. Considering the issue of waiver of sequestration, if it is even raised, outside the presence of prospective jury members would prevent jury members from becoming aware that the sequestration requirement may be waived. In the unlikely event that a jury member is aware of the possibility of waiver, he would still be unable to form prejudices against the defendant because it would be impossible to determine which party refused to consent to the waiver.
The amendment to La.Code Crim.P. art. 791(B) also achieves this result. By requiring both the defendant and the state to agree to the waiver, the defendant is neither placed in a position of having to consent nor is he prejudiced by his refusal to consent to the waiver.
Although 1995 La.Acts Nos. 1172, § 1 and 1277, § 1, effective August 15, 1995, changed the law regarding waiver of the sequestration requirement it may still have limited viability in previously tried cases. To this extent, we overrule those cases prohibiting waiver of the sequestration requirement. Because, at the very least, the defendant in this case impliedly waived the sequestration requirement by acquiescing in the trial court's proposed procedure, this assignment of error is without merit.

SENTENCE REVIEW
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Louisiana Code Crim.P. art. 905.9 provides that this Court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup.Ct.R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) Passion, Prejudice or Any Other Arbitrary Factors
The defendant contends that both prejudice and passion were introduced into the proceedings. To support the prejudice argument, defense counsel points to the fact that the defendant, a 30-year-old black male, was judged by an all white jury. He argues that this was improper since one-third of the population in East Baton Rouge Parish is black, and because both of the victims were white. According to the defendant, "[a]n all-white jury judging Feltus Taylor, ... could not be expected to deliver a verdict free from bias."
*382 We disagree. Upon reviewing the record, we find no evidence of racial prejudice in this jury. Each jury member declared during voir dire examination that race would not influence his/her decision during the sentencing phase of the trial. Furthermore, the state gave adequate race-neutral responses for the exclusion of prospective black jurors, and no systematic race-based exclusion of black jurors can be detected from the record.
To support his argument that the sentence was imposed under the influence of passion, the defendant reasserts his arguments relating to victim impact testimony and comments made by the state about that testimony. We have considered these contentions earlier in the opinion and determined that they do not constitute reversible error. There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence.

(b) Statutory Aggravating Circumstances
In its verdict the jury found the following four aggravating circumstances:
(1) that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery (La.Code Crim.P. art. 905.4(A)(1);
(2) that the defendant knowingly created a risk of death or great bodily harm to more than one person (La.Code Crim.P. art. 905.4(A)(4);
(3) that the defendant had been previously convicted of an unrelated armed robbery (La.Code Crim.P. art. 905.4(A)(3); and
(4) that the offense was committed in an especially heinous, atrocious and cruel manner (La.Code Crim.P. art. 905.4(A)(7).
The defendant contends that the evidence was insufficient to support the "heinous, atrocious and cruel" aggravating circumstance, and that the trial court improperly defined this aggravating circumstance in its charge to the jury.
Where one aggravating circumstance is upheld on review, the failure of another aggravating circumstance will not invalidate the death penalty, unless it can be shown that the evidence of the unproven circumstance injected an arbitrary factor into the proceedings. Scales, 93-2003 at p. 18, 655 So.2d at 1338. It is unnecessary for us to consider whether the "heinous, atrocious and cruel" circumstance was sufficiently proven since no arbitrary factor was injected by this evidence, and since the three remaining aggravating circumstances are more than amply supported by the evidence.
Armed robbery is the taking of anything of value from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La.R.S. 14:64. In the instant case, the evidence supports the jury's finding that the defendant was engaged in the perpetration of an armed robbery when the killing occurred. When called to testify during the sentencing phase of the trial, the defendant admitted committing the robbery. Clark confirmed this testimony by stating that the defendant forced him and Ponsano into the restaurant's storeroom at gunpoint, handcuffed them together, and demanded and took money from the floor safe.
Likewise, the evidence clearly shows that the defendant knowingly created a risk of great bodily harm to more than one person. When called to testify during the sentencing phase, the defendant admitted shooting both Clark and Ponsano. Clark confirmed this during his testimony at the guilt phase.
Finally, it was undisputed that the defendant was previously convicted of an unrelated armed robbery in 1980.

(c) Proportionality to the Penalty Imposed in Similar Cases
Federal constitutional law does not require a proportionality review. Scales, 93-2003 at p. 18, 655 So.2d at 1338, citing Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La.Sup. Ct.R. 28, § 4(b) provides that the district attorney shall file with this Court a list of each first degree murder case tried after January 1, 1976 in the district in which the sentence is imposed. Including this case, the state's list indicates that 50 first degree murder cases have been tried in East Baton Rouge Parish between January 1, 1976 and May 29, 1992. Since January 1, 1976, East *383 Baton Rouge Parish juries have recommended the death penalty in eight of these cases. Six of those cases involved murders committed during the perpetration or attempted perpetration of an armed robbery.[20]
Our review of these cases shows that the penalty in the instant case is not disproportionate. In Scales, supra, the defendant, a 19-year-old black male, and two other men entered a Church's Fried Chicken restaurant. After the defendant proceeded to the restroom, the two other men jumped across the counter, whereupon one man pointed a gun at the pregnant cashier's abdomen while the other emptied the cash register. During this time, a struggle ensued in the lobby near the bathroom, and gunshots were heard. The victim was shot five times. At the time of the murder, the defendant had pending charges against him for armed robbery and simple arson. He had a history of juvenile convictions dating back to 1986, and had been convicted of only one misdemeanor charge as an adult. He consumed large amounts of liquor and marijuana daily. In State v. Williams, 392 So.2d 619 (La.1980), the defendant, a 37-year-old black male, approached the partially-crippled manager of a service station, who was counting receipts with his 12-year-old son, and demanded money. When the manager resisted, the defendant shot him, grabbing the money on his way out. He attempted to fire at two customers, but his gun misfired. At the time of the killing, he was on parole for simple burglary. In State v. Clark, 387 So.2d 1124 (La.1980), the defendant, a 24-year-old white male, and another man forced their way into a Red Lobster restaurant and held the assistant manager at gun- and knifepoint while they emptied the safe. The defendant was a former employee of the restaurant, and had quit his job on the evening immediately prior to the killing after arguing with the assistant manager. After another argument ensued, the defendant used his butcher knife to stab the victim 35 times, then shot him. He had been using drugs for over 10 years. As a juvenile, he had convictions for DWI, drug distribution, obstructing an officer and driving violations. In State v. Williams, 383 So.2d 369 (La.1980), the defendant, a 26-year-old black male, and another male robbed an A & P supermarket while armed with a sawed-off shotgun. During the course of the robbery an elderly security guard attempted to draw his weapon, and the defendant shot him in the face at point-blank range. While the defendant's cohort was taking money from the cash registers, the defendant accidentally shot two customers in the leg. He had prior misdemeanor convictions for resisting arrest and theft.
In the instant case, the defendant shot the victim, an employee of the restaurant during the course of an armed robbery of the restaurant. Thus, we conclude that the sentence of death imposed in this case was not disproportionate with the other first degree murder convictions in this district.
The Uniform Capital Sentence Report reveals that the defendant, a black male, was 30 years old at the time of the offense. He has never been married, and has no children. The defendant was arrested and charged with theft and burglary offenses while he was a juvenile, but was not convicted. When he was 17, he was convicted of armed robbery and served 10 years and three months. The defendant's family history shows that he was abandoned by his biological mother. He was later adopted into an unstable home environment. His adoptive mother and father divorced when he was young. The defendant has a close relationship with his maternal grandmother, who cared for him extensively after the divorce. He performed poorly in school, and was referred to a mental health clinic for evaluation when he was in the tenth grade. At that time, it was determined that he was functioning at the level of a fourth grader. No follow-up treatment was noted. The defendant dropped out of high school before completing the tenth grade. However, he obtained his GED while in prison for the armed robbery. The defendant's psychiatric evaluation reveals that he is of borderline *384 intelligence. It also diagnoses him as suffering from dysthymia, a disturbance of mood that consists of depressive symptoms, and from a borderline personality disorder, which is manifested by unstable intense relationships, impulsivity and dramatic mood swings. A history of intermittent, but not excessive, substance abuse (cocaine and marijuana) was also revealed. Despite these conclusions, it was indicated that the defendant knew right from wrong when he committed the offense.
After having considered the above factors, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until: (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
NOTES
[1] Judge Ned E. Doucet, Jr., Court of Appeal, Third Circuit, participating as Associate Justice Pro Tempore, in place of former Associate Justice James L. Dennis. Calogero, J., not on panel. Rule IV, § 3.
[2] Although the defendant's list of assignments of error ends with number 337, an error in the numbering sequence led to numbers 219 and 220 appearing twice.
[3] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[4] Similar minimum standards must be met by certified appellate lead and appellate associate counsel. See Standards 7-4.1 and 7-5.1, Louisiana Standards on Indigent Defense. Additionally, we note that there are alternative ways to be certified, Standard 7-6.1, but even under this certification procedure the attorneys must still substantially comply with Standards 7-2.1 through 7-5.1.
[5] Assignments of error numbers 1-86, 95, 211, and 326-330.
[6] This case was tried prior to our decision in Bernard. Thus, the issue of admissibility of victim impact evidence under Louisiana law had not been resolved at the time of trial.
[7] Although La.Code Crim.P. art. 905.2 did not specifically provide for the admission of victim impact evidence when Bernard was decided, we interpreted this provision to deem such evidence admissible to the extent allowed by constitutional limitations. Bernard, 608 So.2d at 970-71. The legislature subsequently amended Article 905.2 to specifically provide that the sentencing hearing should focus, in part, on "the impact that the death of the victim has had on the family members." 1994 La.Acts No. 14 § 1.

As previously noted, the defendant's trial took place after the Supreme Court rendered Payne but before this Court decided Bernard and before the legislature amended Article 905.2. Nevertheless, because the result in Bernard was dictated by Payne and does no more than apply Payne's holding to the former Louisiana statute, application to the defendant of the standards set forth in Bernard does not implicate retroactivity concerns.
[8] Because this testimony was elicited during the sentencing phase, the lack of a contemporaneous objection does not preclude our review of all errors relating thereto.
[9] In addition to the three witnesses it called at the sentencing phase, the defendant complains about testimony elicited during the guilt phase by state witnesses Viola Kaglear, a co-worker; Keith Clark, the other victim; and Bill Stiglets, the owner of Cajun's. These three witnesses referred to their close relationship to Ponsano and to her good qualities. This testimony clearly did not violate this Court's caution in Bernard.
[10] The defendant was represented by two able criminal defense lawyers. Neither lodged an objection to the district attorney's comments during closing arguments. Under either the scope of review established in Smith or the limited scope of review to which we return today, the lack of an objection is a factor to be considered in examining the impact of a prosecutor's closing argument. Particularly, the lack of an objection demonstrates the defense counsels' belief that the live argument, despite its appearance in the cold record, was not overly damaging. Brooks v. Kemp, 762 F.2d 1383, 1397 n. 19 (11th Cir.1985), cert. granted and judgment vacated on other grounds. 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986).
[11] Assignments of error numbers 309-312, and 326-333.
[12] Subsection (B) of Article 788 provides: "If the court does not require tendering of jurors, it shall by local rule provide for a system of simultaneous exercise of challenges." At the time of the trial, the 19th Judicial District Court did not have a rule requiring simultaneous charges. In January of 1994, the court adopted such a requirement. See 19th J.D.C.Crim.R. 14.
[13] The defense reasserted its objection to the trial court's refusal to allow "back strikes" in a motion for mistrial filed at the beginning of the penalty phase. The trial court denied the motion.
[14] Assignments of error numbers 185, 199-200, and 326-330.
[15] No objection to the introduction of this evidence was necessary. La.Code Crim.P. art. 841(B) ("The requirement of an objection shall not apply to the court's ruling on any written motion.")
[16] The defendant relies upon State v. Hattaway, 621 So.2d 796 (La.1993), to support his argument that the second confession was inadmissible. Therein, the Court held that there could never be a valid waiver of the right to counsel by the defendant once the right to counsel attached and an attorney had either been requested by the defendant or appointed for him. This holding no longer applies in light of our recent decision in State v. Carter, 94-2859 (La. 11/27/95), 664 So.2d 367, wherein we overruled this portion of Hattaway.
[17] Assignment of error number 317.
[18] Louisiana Code Crim.P. art. 791(B) was amended by 1995 La.Acts Nos. 1172, § 1 and 1277, § 1. See discussion infra.
[19] During oral argument the state claimed that the state and defense counsel had agreed to this procedure, and had suggested it to the trial court. Defense counsel did not dispute this claim. We review the alleged error due to its potential seriousness.
[20] Of these, three sentences have been vacated. State v. Clark, 492 So.2d 862 (La.1986); State v. Williams, 392 So.2d 619 (La.1980); State v. Clark, 387 So.2d 1124 (La.1980). One defendant has been executed. State v. Williams, 383 So.2d 369 (La.1980). Another has had his conviction overturned. State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278.